UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

GERALD CULHANE and CAROL
CULHANE,

                    Plaintiffs,                        **DECISION AND ORDER**

           v.                                          1:17-CV-00005 EAW

UNITED STATES OF AMERICA,

                    Defendant.
_____

## INTRODUCTION

Plaintiffs Gerald Culhane ("Mr. Culhane") and Carol Culhane ("Mrs. Culhane") (collectively, "Plaintiffs") commenced this action on January 3, 2017, alleging a cause of action against the United States of America ("Defendant") pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 2671-2680 (the "FTCA"). (Dkt. 1). Plaintiffs seek damages due to the alleged negligence of Defendant's employees in failing to timely diagnose several cancerous growths Mr. Culhane suffered from while under Defendant's care. (*Id.* at ¶ 11).

On August 20, 2013, Mr. Culhane saw his primary care physician at the Buffalo Veteran's Administration Medical Center ("Buffalo VAMC") complaining of a lump in his left neck that had been present for three months. A computed tomography ("CT") scan was ordered, and on September 5, 2013, the results of the CT scan were reviewed and found to be unremarkable. However, a mass was obviously present in the CT images. Mr. Culhane was notified of the purportedly negative test results the same day, and there was no follow up on the lump. Over a year-and-a-half later, on April 27, 2015, Mr. Culhane

- 1 -

called the Buffalo VAMC to report that the lump on his left neck was growing and requested another medical evaluation.  Another CT scan of his neck was performed on May 11, 2015, and it was discovered that a large, submandibular mass was present in both the 2013 and 2015 CT scans.  The lump was determined to be keratinizing squamous cell carcinoma in the left palatine tonsil, and Mr. Culhane underwent 40 radiation treatments and seven cycles of weekly intravenous chemotherapy, which he completed on August 25, 2015.  Although this initial treatment appeared successful, on January 24, 2017, a recurrence of the cancer was discovered in Mr. Culhane's tonsil.  He underwent a radical tonsillectomy and a left modified neck dissection on March 23, 2017.

In addition, on January 13, 2014, Mr. Culhane was examined at the Buffalo VAMC Dermatology Clinic to evaluate a skin lesion on his right temple.  A benign condition was diagnosed and liquid nitrogen cryotherapy used on the lesion.  Mr. Culhane returned to the Dermatology Clinic on April 18, 2014, and a punch biopsy of the lesion was performed. On April 22, 2014, Henry D. Friedman, M.D. ("Dr. Friedman"), diagnosed a benign condition based on the sample taken, and Mr. Culhane was told that the lesion was non-malignant.  On February 23, 2015, Mr. Culhane was evaluated by a dermatologist in Rochester, New York, for a different skin issue.  (*Id.* at ¶ 59).  The dermatologist performed a shave biopsy of the right temple lesion the same day and confirmed the diagnosis of a malignant melanoma.  On March 24, 2015, a Mohs surgical excision of the malignant melanoma was performed at Strong Memorial Hospital in Rochester, New York.

Defendant concedes that it owed a duty to Mr. Culhane, and that the failure to diagnose Mr. Culhane with squamous cell carcinoma in September 2013 was a departure

from the standard of care.  (Dkt. 52 at 14).  The parties dispute proximate cause as to the squamous cell carcinoma.  Specifically, while Plaintiffs concede that Mr. Culhane would have had to undergo chemotherapy and radiation regardless of when the squamous cell carcinoma was diagnosed, they contend that the recurrence of the cancer and the surgery Mr. Culhane underwent to treat the recurrence were a result of the delay in diagnosis. Defendant argues that the delay in diagnosis of the squamous cell carcinoma did not cause the recurrence, diminish Mr. Culhane's chance of a better outcome, or increase his injury. The parties also dispute whether there was a delay in diagnosis and treatment of the melanoma.  Whereas Plaintiffs contend Defendant deviated from the standard of care as to the diagnosis and treatment of Mr. Culhane's cancers, Defendant maintains that the diagnosis and treatment of the skin lesion in 2014 was reasonable.

After considering all of the evidence, the Court finds that Plaintiffs have failed to establish medical malpractice for failure to timely diagnose Mr. Culhane's malignant melanoma, but have established medical malpractice for failure to timely diagnose Mr. Culhane's squamous cell carcinoma.  The Court finds that Plaintiffs have established their entitlement to recover a total of $1,950,000 in damages for the injuries that they have proven they suffered as a result of Defendant's actions.   This Decision and Order constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## PROCEDURAL BACKGROUND

Plaintiffs filed the instant matter on January 3, 2017.  (Dkt. 1).  Defendant filed its Answer on March 6, 2017 (Dkt. 9), and the case was referred to United States Magistrate

Judge Michael J. Roemer for all pretrial matters excluding dispositive motions.  (Dkt. 10).

Discovery closed on May 17, 2019 (Dkt. 40), and a pretrial conference was held on

December 19, 2019, before the undersigned, where the parties stipulated to the dismissal

of Plaintiffs' third cause of action with prejudice (Dkt. 63; Dkt. 64).  A bench trial

commenced on January 13, 2020.  (Dkt. 73).  After nine days of testimony spread out over

the course of several months, the bench trial concluded on June 16, 2020.  (Dkt. 93).

Following the bench trial, the parties submitted their written summations and

proposed findings of fact and conclusions of law on July 22, 2020.  (Dkt. 97; Dkt. 98; Dkt.

99; Dkt. 100; Dkt. 101; Dkt. 102).  Responsive proposed findings of fact and conclusions

of law were submitted on July 31, 2020.  (Dkt. 103; Dkt. 104; Dkt. 105).

## FINDINGS OF FACT

The following section constitutes the Court's Findings of Fact pursuant to Federal

Rule of Civil Procedure 52(a)(1).  The Court has made its Findings of Fact based on the

testimony and exhibits presented at trial, and has discussed only those issues considered

"material to the resolution of the parties' claims."  *Cliffstar Corp. v. Alpine Foods, LLC*,

No. 09-CV-00690-JJM, 2016 WL 2640342, at *1 (W.D.N.Y. May 10, 2016) (citing *I.N.S.*

*v. Bagamasbad*, 429 U.S. 24, 25 (1976) ("[C]ourts . . . are not required to make findings

on issues the decision of which is unnecessary to the results they reach.")).  Moreover, "the

distinction between law and fact is anything but clear-cut" and therefore, "for purposes of

appellate review, the labels of fact and law assigned" should not be considered controlling.

*Id.* (quotation marks and citations omitted).

- 4 -

## I.    Burden of Proof

"In a civil case, the plaintiff bears the burden of proving the elements of his claim by a preponderance of the evidence." *Brown v. Lindsay*, Nos. 08-CV-351, 08-CV-2182, 2010 WL 1049571, at *12 (E.D.N.Y. Mar. 19, 2010). "To establish a fact by a preponderance of the evidence means to prove that the fact is more likely true than not true." *Id.* (quoting *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997)). "Under the preponderance of the evidence standard, if the evidence is evenly balanced, the party with the burden of proof loses." *Richardson v. Merritt*, No. 12-CV-5753 (ARR), 2014 WL 2566904, at *5 (E.D.N.Y. June 4, 2014) (citing *Kosakow v. New Rochelle Radiology Assocs.*, 274 F.3d 706, 731 (2d Cir. 2001)). In other words, if the credible evidence on a given issue is evenly divided between the parties—that it is equally probable that one side is right as it is that the other side is right—then the plaintiff has failed to meet his burden. "An affirmative defense, by contrast, is a defense that the defendants must assert and prove, and for which they have the burden." *Amerio v. Gray*, No. 5:15-CV-538, 2019 WL 5307248, at *2 (N.D.N.Y. Oct. 21, 2019); *see Barton Grp., Inc. v. NCR Corp.*, 796 F. Supp. 2d 473, 498 (S.D.N.Y. 2011) ("[A] defendant asserting an affirmative defense bears the burden of proof with respect to that defense."), *aff'd*, 476 F. App'x 275 (2d Cir. 2012).

## II.    Undisputed Facts[1]

The parties stipulate to the following facts. On August 20, 2013, Mr. Culhane went to see Caroline E. Fernandez, M.D. ("Dr. Fernandez"), his primary care physician at the

---

[1]     The following facts are taken from the parties' written stipulation, which was entered into evidence as Court Exhibit 1.

Buffalo VAMC.  (Dkt. 70 at ¶ 1).  Mr. Culhane complained of a "lump in the left neck" that had been present for three months.  (*Id.*).  Dr. Fernandez's physical examination of the left submandibular area of Mr. Culhane's neck, *i.e.*, the area under his left jaw, revealed a four-by-five-centimeter firm mass.  (*Id.*).  Dr. Fernandez suspected the mass was a neoplasm, or tumor, and she ordered a CT scan be done of his neck, both with and without contrast dye.  (*Id.*).  She noted that an ear, nose, and throat ("ENT") consultation would follow the CT.  (*Id.*).

On September 4, 2013 a CT scan was performed on Mr. Culhane's neck at the Buffalo VAMC.  (*Id.* at ¶ 2).  The CT imaging was done without contrast, although Mr. Culhane's medical records do not indicate that Dr. Fernandez's order for a CT with contrast dye was ever contraindicated.  (*Id.*).  Angelo DelBalso, M.D. ("Dr. DelBalso") interpreted the non-contrast imaging of Mr. Culhane's neck and reported, "no submandibular mass lesions noted," and "subcentimeter sized benign submandibular lymph nodes are identified."  (*Id.* at ¶ 3).  However, without contrast, a 2.5 by 4-centimeter Level II, left-sided mass was visible on the September 3, 2013 CT images.  (*Id.*).

On September 5, 2013, based on Dr. DelBalso's CT interpretation, Dr. Fernandez wrote as an Addendum to her Primary Care Note of August 20, 2013: "Good news: No evidence of a mandibular tumor that will require biopsy."  (*Id.* at ¶ 4).  The same day, Michelle Gaylord, Registered Nurse ("RN"), noted in another Addendum to the Primary Care Note of August 20, 2013, that Mr. Culhane had been notified of his CT scan results.  (*Id.*).  Mr. Culhane was not referred to an ENT physician.  (*Id.*).  Dr. Fernandez examined Mr. Culhane at "routine follow-up" visits on December 3, 2013, June 2, 2014, and

December 10, 2014.  (*Id.* at ¶ 5).  At each of these visits, she listed "Neoplasm of uncertain behavior of neck" under the "Active Problem" list.  (*Id.*).  The parties dispute what occurred at these visits.  (*Id.*).

In Dr. Fernandez's notes for the December 3, 2013, follow-up visit, she wrote there was a "0.3 x 0.3 irregular flat brown lesion with darkened center on the right temple," and referred Mr. Culhane for a dermatology consult.  (*Id.* at ¶ 6).  On January 13, 2014, Mr. Culhane went to the Buffalo VAMC Dermatology Clinic, where he was examined by dermatology resident Jennifer Powell, M.D. ("Dr. Powell").  (*Id.* at ¶ 7).  Dr. Powell noted no personal or family history of skin cancer.  (*Id.*).  Mr. Culhane told Dr. Powell that a skin lesion on his right temple had been "present for over one year and [that he] thinks it is gradually enlarging."  (*Id.*).  Dr. Powell noted a 1.6 by 1.8 centimeter "asymmetric light to dark brown very thin plaque with a waxy and stuck-on appearance."  (*Id.*).  She diagnosed a "probable large seborrheic keratosis," treated the lesion with liquid nitrogen cryotherapy, and instructed Mr. Culhane to return for follow-up care in three months.  (*Id.*).

On April 18, 2014, Mr. Culhane went to the VAMC Dermatology Clinic[2] for his three-month follow-up appointment.  (*Id.* at ¶ 8).  Dermatology resident Amanda B. Carpenter, M.D. ("Dr. Carpenter") examined him and noted that cryotherapy had not resolved the lesion on Mr. Culhane's right temple.  (*Id.*).  Mr. Culhane told Dr. Carpenter that the lesion had been present for several years and that he did not think it had grown in

---

[2]    The doctors practicing at the VAMC Dermatology Clinic are not VA employees, but instead are independent contractors.  (Dkt. 98 at ¶ 50).  Accordingly, none of the claims in this lawsuit are brought against the VAMC Dermatology Clinic practitioners.

size or changed in color since his last visit, but that it was difficult for him to see and monitor given its location.  (*Id.*).  Dr. Carpenter described the lesion as "[r]ight temple asymmetric, irregularly pigmented light to dark brown patch measuring 2.0 x 1.8 cm," and diagnosed "[n]eoplasm uncertain behavior of skin" with a differential diagnosis of "solar lentigo vs lentigo maligna vs seborrheic keratosis."  (*Id.*).  To "aid in diagnosis and rule out Lentigo Maligna," Dr. Carpenter performed a 0.4 by 0.3 by 0.3 centimeter punch biopsy of the lesion, which is a procedure in which a small round piece of tissue is removed using a sharp, hollow, circular instrument.  (*Id.*).

On April 23, 2014, the surgical pathology report of the punch biopsy was diagnosed by pathologist Dr. Friedman as "[s]olar lentigo, focal early junctional nevus, focal mild melanocytic atypia."  (*Id.* at ¶ 9).  Mr. Culhane had a follow-up appointment at the Dermatology Clinic with Dr. Carpenter on April 25, 2014.  (*Id.* at ¶ 10).  Dr. Carpenter removed Mr. Culhane's sutures and told him that the biopsy of the lesion on his right temple showed Solar Lentigo, a non-malignant condition. (*Id.*).  Dr. Carpenter told Mr. Culhane to perform monthly skin checks and advised him to return to the Dermatology Clinic for follow-up in three months.  (*Id.*).  At Mr. Culhane's June 2, 2014, and December 10, 2014, evaluations with his primary care physician Dr. Fernandez, she did not make any reference to the lesion on Mr. Culhane's right temple.  (*Id.* at ¶ 11).  Mr. Culhane canceled an appointment with the VA's Dermatology Clinic in August 2014.  (*Id.* at ¶ 12).

On February 23, 2015, Mr. Culhane consulted with non-VA dermatologic specialist Michael Bobrow, M.D. ("Dr. Bobrow") regarding a hyperkeratotic plaque on the lower helix of his ear.  (*Id.* at ¶ 13).  During the course of his examination, Dr. Bobrow noticed a

lesion on Mr. Culhane's right temple, referred to in his report as the right lateral canthus. (*Id.*).  Mr. Culhane told Dr. Bobrow that the lesion had been previously biopsied at the VA and found to be benign.  (*Id.*).  Noting that the "area was very atypical in appearance," Dr. Bobrow requested and received the VAMC pathology report that had been performed ten months earlier.  (*Id.*).  His review of the report led him to "certainly worry about sampling error."  (*Id.*).  Dr. Bobrow performed three shave biopsies of the lesion.  (*Id.*).  The pathology report of the shave biopsies revealed the presence of "in situ melanoma of the lentigo maligna type that extends to the lateral margins."  (*Id.* at ¶ 14).

On March 3, 2015, Dr. Bobrow told Mr. Culhane that the results of the shave biopsies revealed malignant melanoma.  (*Id.* at ¶ 15).  Because a specialized type of surgery would be required to remove the lesion, Dr. Bobrow referred Mr. Culhane to Marc D. Brown, M.D. ("Dr. Brown"), of University Dermatology Associates.  (*Id.*).  On March 24, 2015, Dr. Brown performed a Mohs surgical excision of the malignant melanoma at Strong Memorial Hospital.  (*Id.* at ¶ 16).  Dr. Brown performed a rotation flap on March 26, 2015, to close the skin defect that resulted from the modified Mohs procedure.  (*Id.* at ¶ 17).  On April 2, 2015, Mr. Culhane had a post-operative follow-up appointment with Dr. Brown, and he continues to have skin checks with Dr. Bobrow every three to six months.  (*Id.* at ¶¶ 18-19).

On April 27, 2015, Mr. Culhane telephoned his primary care provider to report "a growth on the left side of my face which seems to be growing fast" and to request an evaluation.  (*Id.* at ¶ 20).  On April 30, 2015, Mr. Culhane was evaluated at the Buffalo VAMC by Family Nurse Practitioner ("FNP") Cheryl L. Rymarkczyk.  (*Id.* at ¶ 21).  Mr.

Culhane's chief complaint was an enlarging, painless left neck mass and lower jaw swelling, and he also complained of pain on palpation of his left ear tragus. (*Id.*). He reported that the mass had been present for two-to-three years, but had been getting larger over the past few months, and that he thought that it was twice the size now. (*Id.*). Ms. Rymarkczyk ordered antibiotics and a CT scan of Mr. Culhane's neck and soft tissues, noting a "probable enlarged lymph node." (*Id.*).

On May 11, 2015, a CT scan of the neck with and without intravenous contrast was performed on Mr. Culhane at the Buffalo VAMC. (*Id.* at ¶ 22). Radiologist Michelle Ding, M.D. ("Dr. Ding"), interpreted the study and compared the images with the CT scan performed twenty months earlier, on September 4, 2013. (*Id.*). Dr. Ding noted that a "left level II lymph node posterior to the submandibular gland has increased in size and is heterogeneous in appearance measuring 2.5 X 4 X 4.1 cm (previously 2.4 X 2.5 X 3.8 cm on 9/4/13)." (*Id.* at ¶ 23). Dr. Ding also reported that "[i]n the region of the left oropharynx adjacent to the palatine tonsil, there is an area of fullness and slight increase in enhancement measuring 2 X 1.3 cm (image 57/85), and underlying mass lesion cannot be excluded." (*Id.*). Dr. Ding concluded that the increased size of the left level II lymph node "in conjunction with slight fullness in the left palatine tonsil is worrisome for underlying neoplasm within the oral cavity with adjacent adenopathy. Correlation should be made with direct visualization and tissue sampling." (*Id.*).

On May 19, 2015, Mr. Culhane had an ENT consultation with Dwight M. Patterson, M.D. ("Dr. Patterson"), at the Buffalo VAMC. (*Id.* at ¶ 24). Dr. Patterson's physical examination noted the presence of a "mobile, non-tender, 4 X 5 cm firm mass" in Mr.

- 10 -

Culhane's upper neck.  Dr. Patterson performed a flexible fiberoptic laryngoscopy and a fine needle aspiration biopsy of Mr. Culhane's left neck mass that day in his office.  (*Id.*). Following his examination of Mr. Culhane, Dr. Patterson wrote in his Progress Note:

> Although [the patient] is a non-smoker and his neck mass has been present for 2 years, this is concerning for an underlying malignancy.  An underlying tonsil cancer cannot be completely excluded by exam alone.  Squamous cell carcinoma and lymphoma would be the most common, but other malignant and benign possibilities exist, and this was discussed with [Mr. Culhane] and his wife in detail today.
>
> Fine needle aspiration biopsy was performed today without problem.

(*Id.*).

On May 26, 2015, Dr. Patterson informed Mr. and Mrs. Culhane that the biopsy was consistent with squamous cell carcinoma ("SCC"), which is a cancer of the thin, flat cells that make up the lining of the oropharynx.  (*Id.* at ¶ 25).  Dr. Patterson noted that the report from the September 4, 2013 CT scan of Mr. Culhane's neck "does not discuss this mass." (*Id.*).  Although SCC metastatic disease to the neck had been confirmed by biopsy, Dr. Patterson was not able to identify the primary site of the cancer.  (*Id.* at ¶ 26).  An expedited positron emission tomography ("PET") scan and a staging panendoscopy were scheduled. (*Id.*).

On June 4, 2015, a PET scan was performed on Mr. Culhane.  (*Id.* at ¶ 27).  The PET scan revealed "focal hypermetabolic activity within the left tonsillar region most likely a primary head and neck malignancy."  (*Id.* (original alteration omitted)).  The report also indicated "hypermetaboic cervical lymph nodes as described above consistent with metastatic disease."  (*Id.* (original alteration omitted)).  On June 12, 2015, Dr. Patterson

- 11 -

performed a direct laryngoscopy, bronchoscopy, and biopsies on Mr. Culhane under general anesthesia. (*Id.* at ¶ 28). The primary malignancy site was subsequently identified as the left palatine tonsil, and the biopsy was consistent with keratinizing SCC. (*Id.*). Using American Joint Committee of Cancer ("AJCC") staging criteria, Mr. Culhane's cancer was classified as a T2 N2b M0 Stage IVA HPV+ SCC. (*Id.*).

Head and neck cancers are staged according to a "TNM" model that includes the primary tumor stage ("T"), the node involvement status ("N"), and the presence or absence of distant metastatic disease ("M"). (*Id.* at ¶ 29). The combination of the T, N, and M stages results in a group stage of I, II, III, or IV. (*Id.*). Stage IVA is locally advanced, non-metastatic cancer. "HPV" stands for human papilloma virus. (*Id.* at ¶ 30). HPV can be a cause of oropharyngeal cancer ("OPC")—that is, cancers of the tonsil, base and posterior one-third of the tongue, soft palate, and posterior and lateral pharyngeal walls. (*Id.*).

Because the abnormal enlargement of Mr. Culhane's left, Level II cervical lymph node, clearly visible on the September 4, 2013 neck CT scan, was not identified and acted upon when it should have been, diagnosis and treatment of the SCC of Mr. Culhane's left palatine tonsil was delayed by 20 months. (*Id.* at ¶ 31). On June 16, 2015, a Head and Neck Oncology conference was held at the Buffalo VAMC to discuss Mr. Culhane's case. (*Id.* at ¶ 32). Dr. Patterson recorded in the Progress Notes:

> Potentially curative treatment options include primary surgery to include a radical tonsillectomy with a comprehensive neck dissection. It appears most likely that he would require radiation therapy after surgery. Alternatively, concurrent chemoradiation could be given as a primary treatment with surgery reserved for salvage treatment. Most patients with his type and stage of tumor elect for primary chemo radiation given the morbidity of surgery.

(*Id.*).  A percutaneous endoscopic gastrostomy ("PEG") tube to supplement Mr. Culhane's nutrition and hydration was surgically inserted on June 19, 2015.  (*Id.* at ¶ 33).

On June 22, 2015, Mr. Culhane had a Radiation Oncology consult with Vilasini Shanbhag, M.D.  ("Dr. Shanbhag").  (*Id.* at ¶ 34).  On June 30, 2015, Mr. Culhane had the first of forty radiation treatments at CCS Oncology in Lockport, New York.  (*Id.* at ¶ 35).  He was then driven to the Buffalo VAMC for the first of seven cycles of weekly intravenous chemotherapy with Carboplatin AUC 2 and Paclitaxel (Taxol) 50 mg/m2.  (*Id.*).  Thereafter, Mr. Culhane received an additional six cycles of chemotherapy between July 6, 2015 and August 25, 2015.  (*Id.*).  Because he experienced severe side effects of the chemoradiation, Mr. Culhane had treatment breaks in weeks four and seven of his scheduled treatment regimen.  (*Id.* at ¶ 36).  His final radiation treatment was on September 10, 2015.  (*Id.*).

On September 29, 2015, Mr. Culhane was seen by Oncology.  (*Id.* at ¶ 37).  Rose M. Bell, Ph.D., Adult Nurse Practitioner ("ANP"), performed a physical examination during which Mr. Culhane's left mandibular neck mass was no longer palpable.  (*Id.*).  On December 14, 2015, a PET/CT scan of Mr. Culhane's body was performed at the Buffalo VAMC.  (*Id.* at ¶ 38).  The study revealed:

> Marked interval decrease in left tonsillar hypermetabolic activity in area of known malignancy, and resolution of left cervical hypermetabolic lymphadenopathy.  However, there is asymmetric increased uptake within the right tonsillar region with small area of calcification—malignancy in this area cannot be excluded—clinical correlation is recommended.

(*Id.*).

On December 15, 2015, Mr. Culhane sought a second opinion from Dr. Wesley Hicks ("Dr. Hicks"), a head and neck surgeon at Roswell Park Cancer Institute.  (*Id.* at ¶ 39).  Dr. Hicks explained that based on the VA notes, Mr. Culhane was staged correctly. (*Id.*).  He informed Mr. Culhane that altered taste is a common side effect of treatment and that over time he might have some sense of taste return, but some of it would be a permanent loss.  (*Id.*).  Based on a video-assisted nasopharynlaryngoscopy, Dr. Hicks noted "normal post-treatment changes, no residual/recurrent masses or lesions."  (*Id.*).

On December 21, 2015, Mr. Culhane returned to the VAMC ENT Clinic, where he was seen by Dr. Patterson.  (*Id.* at ¶ 40).  Dr. Patterson noted that Mr. Culhane "appears to be doing very well overall now just 3 months after completing concurrent chemoradiation therapy" and commented on the "moderately elevated hypermetabolic activity" noted in the right tonsil on the recent PET scan, observing: "No evidence of disease is noted on careful head and neck exam today including flexible laryngoscopy.  Whereas second lesion is possible, SUV uptake in this range is often seen after treatment for head and neck cancer and is not highly specific for malignancy."  (*Id.*).  At the visit on December 21, 2015, Dr. Patterson gave Mr. and Mrs. Culhane the names of two other physicians, one of whom was Dr. Thom Loree ("Dr. Loree").  (*Id.* at ¶ 41).

On February 29, 2016, Mr. Culhane consulted with Dr. Loree, a head and neck surgeon at Erie County Medical Center ("ECMC"), for a third opinion on his tonsil cancer. (*Id.* at ¶ 42).  Dr. Loree found no evidence of disease at that time.  (*Id.*).  He recommended that Mr. Culhane follow-up with him in May 2016, after a repeat surveillance CT scan was done of his neck and chest.  (*Id.*).  On April 25, 2016, a CT of Mr. Culhane's neck with

and without contrast was done.  (*Id.* at ¶ 43).  On May 23, 2016, Mr. Culhane had a follow-up visit with Dr. Loree, who found no evidence of disease.  (*Id.* at ¶ 44).

On September 12, 2016, Mr. Culhane again followed up with Dr. Loree, who noted that Mr. Culhane "had a sore throat last week that has since subsided."  (*Id.* at ¶ 45).  Mr. Culhane denied difficulty swallowing and difficulty chewing, continued to experience a dry mouth and did not have a sense of taste, and denied pain.  (*Id.*).  Dr. Loree reviewed the results of CT scans of the neck and thorax taken on August 19, 2016.  (*Id.*).  Clinically, Dr. Loree found no evidence of disease.  (*Id.*).  Dr. Loree planned to see Mr. Culhane back in the office in January 2017 after a repeat CT scan of the neck and thorax with contrast.  (*Id.*).  Dr. Loree advised Mr. Culhane that he should call the office if he had chronic sore throats or persistent bad breath, because those could be evidence of disease recurrence.  (*Id.*).

On December 12, 2016, Mr. Culhane followed up at the Buffalo VAMC with Dr. Patterson, whom he told about a "burning sensation" in his mouth.  (*Id.* at ¶ 46).  His weight and appetite had been stable.  (*Id.*).  Dr. Patterson performed a flexible laryngoscopy that he noted was within normal limits.  (*Id.*).  Dr. Patterson's head and neck examination revealed no evidence of disease.  (*Id.*).  He told Mr. Culhane to follow up with him in three to four months.  (*Id.*).

The next day, on December 13, 2016, Mr. Culhane visited his primary care physician, Sarah Thompson, M.D. ("Dr. Thompson"), for a routine follow-up.  (*Id.* at ¶ 47).  Dr. Thompson noted:

> He's recently seen ENT and tonsillar cancer appears to remain in remission. But his mouth feels like it "is on fire" X 6-8 weeks. States cannot tolerate hot or cold food. Did have some bouts of thrush that has resolved. Toothpaste burns.
>
> As he continues to heal from radiation therapy, he's developed burning mouth syndrome.

(*Id.*).

A VAMC Nursing Note by Renee Cookfair, RN, from January 5, 2017, reads: "Dr. Loree's office called requesting a new CT exam for this pt. Please order." (*Id.* at ¶ 48). On January 9, 2017, Mr. Culhane had a follow-up visit with Dr. Loree. (*Id.* at ¶ 49). Dr. Loree noted that his last CT scan was in August 2016 and wrote:

> He has not had a CT scan as the Veterans Administration would not cover it, did not feel it was necessary. He complains of burning tongue sensation and burning sensation of the lower lip which is short term and no significant pain. He is concerned that he has an ulcer of the left posterior oral tongue near the last molar. No radiating pain. No ear pain. He is tolerating a regular diet.

(*Id.*). Dr. Loree's clinical examination of Mr. Culhane revealed no evidence of disease. (*Id.*). Dr. Loree requested that Mr. Culhane get a surveillance CT scan of the neck and chest and then return to his office. (*Id.*).

In a January 10, 2017 addendum to Dr. Patterson's December 12, 2016 ENT note, Russell C. Talma, Physician's Assistant ("PA"), wrote that he spoke with Dr. Loree, who requested a repeat CT scan to follow the hilar node and "also due to a complaint of new burning in the throat and taste change to evaluate for occult recurrence." (*Id.* at ¶ 50). In a January 10, 2017 addendum to RN Cookfair's January 5, 2017 Nursing Note, PA Talma wrote that the CT scans for Mr. Culhane had been ordered and could be scheduled. (*Id.* at ¶ 51).

On January 24, 2017, a CT scan of Mr. Culhane's neck and chest was done at the Buffalo VAMC. (*Id.* at ¶ 52). The CT scan revealed the presence of "a heterogeneously enhancing mass-appearing focus of approximately 11.1 x 12.9 millimeters at the left palatine tonsil, question for local recurrence." (*Id.*). Mr. Culhane also had a slightly enlarged left level IIa lymph node. (*Id.* at ¶ 53). In a January 27, 2017 addendum to Dr. Patterson's December 12, 2016 ENT note, PA Talma wrote that a CT scan of the neck and thorax had been obtained and revealed a left tonsil mass. (*Id.*). A PET scan was ordered, and the CT scan results and recommendation for PET were discussed with Mr. Culhane. (*Id.*).

A PET/CT scan performed on Mr. Culhane on February 1, 2017, revealed intense tracer uptake at the left palatine tonsil and scattered lymph nodes in the left neck. (*Id.* at ¶ 54). In a February 1, 2017 addendum to Dr. Patterson's December 12, 2016 ENT note, PA Talma wrote that Mr. Culhane was called and told about the PET scan results, and that he should keep his follow-up appointment with Dr. Loree. (*Id.* at ¶ 55). On February 6, 2017, Mr. Culhane had a visit with Dr. Loree, who wrote: "The patient recently was recommended to have a follow-up CT scan performed through the Veterans Administration Hospital; however that institution did not cover it. They did not feel it was necessary." (*Id.* at ¶ 56). Mr. Culhane continued to complain of a burning tongue sensation and a burning sensation of the lower lip. (*Id.*). He was also concerned with some ulceration of the left posterior oral tongue near the last molar. (*Id.*). He did not have any radiating pain, he denied ear pain, and he said he could tolerate a regular diet. (*Id.*). Imaging from February 1, 2017, was reviewed and revealed a "hypermetabolic lesion on the left palatine

- 17 -

tonsillar area that is worrisome for malignancy.  There are also scattered lymph nodes also noted in the left neck which are equivocal for malignancy.  There is intense tracer uptake in the left tonsil area."  (*Id.*).  Dr. Loree's impression was that Mr. Culhane had recurrent T2 N2b HPV+ left tonsil cancer.  (*Id.*).  Mr. Culhane was scheduled for a direct laryngoscopy and biopsy of the left tonsil.  (*Id.*).

On February 16, 2017, Dr. Loree performed a direct laryngoscopy and biopsy of the left tonsil on Mr. Culhane at ECMC.  (*Id.* at ¶ 57).  On February 27, 2017, Mr. Culhane had a follow-up visit with Dr. Loree.  (*Id.* at ¶ 58).  Treatment options were discussed. (*Id.*).  At Dr. Loree's recommendation, Mr. Culhane agreed to undergo a per oral radical tonsillectomy and left neck dissection.  (*Id.*).  On March 23, 2017, Dr. Loree performed a radical tonsillectomy and a left modified neck dissection on Mr. Culhane under general anesthesia.  (*Id.* at ¶ 59).

## III.   <u>Mr. Culhane's Malignant Melanoma Diagnosis</u>

Plaintiffs contend that Dr. Friedman committed medical malpractice in connection with Mr. Culhane's malignant melanoma diagnosis, because (1) Dr. Friedman should have diagnosed Mr. Culhane with melanoma in situ in April 2014 and (2) Dr. Friedman should have "recommended further work-up such as a shave biopsy."  (Dkt. 105 at ¶ 114).[3]

The parties presented two expert witnesses regarding Mr. Culhane's malignant melanoma diagnosis.  Plaintiffs rely on the testimony of Terence J. Harrist, M.D. ("Dr.

---

[3]      In its proposed conclusions of law, Defendant made numerous contentions about the quality of the care provided by Dr. Powell and Dr. Carpenter.  (*See* Dkt. 98 at ¶¶ 44-67).  However, Plaintiffs made clear in their response papers that they "made no claim against these dermatologists."  (Dkt. 105 at ¶ 113).

Harrist"), while Defendant relies on the testimony of Gary Goldenberg, M.D. ("Dr. Goldenberg"). These expert witnesses provided different opinions with respect to several material facts, including whether Dr. Friedman misdiagnosed the original slide of the punch biopsy specimen of the skin lesion on Mr. Culhane's forehead (hereinafter "Original Slide") and whether Mr. Culhane had melanoma in April 2014.

### A. General Challenges to Credibility of Experts

Dr. Harrist is a board-certified pathologist and dermatopathologist (Dkt. 83 at 9[4]), and Dr. Goldenberg is a board-certified dermatologist and dermatopathologist (Dkt. 95 at 5). The Court generally found Dr. Harrist and Dr. Goldenberg both to be well-qualified, credible expert witnesses.

Defendant contends that Dr. Goldenberg's opinion is generally more credible than Dr. Harrist's opinion because Dr. Goldenberg's experience and research related to treating patients with skin conditions are more current than that of Dr. Harrist. (Dkt. 98 at ¶¶ 40-41). It may be true that Dr. Goldenberg has more experience and knowledge of the actual treatment of patients; however, the actions of the doctors who treated and interfaced with Mr. Culhane in person are not the key issues in the instant matter. Instead, Plaintiffs bring claims focused on the actions of the pathologist who examined Mr. Culhane's slide. Accordingly, Dr. Harrist's knowledge and experience are highly relevant to the instant matter.

---

[4] In referencing the trial transcript, the Court cites to the CM/ECF-generated page numbers, not the transcript pagination.

Defendant also argues that Dr. Harrist's opinion lacks credibility because he testified that he participated in Mohs surgeries with patients who were diagnosed with melanoma, basal cell, and squamous cell carcinoma, and Dr. Goldenberg testified that the overwhelming majority of Mohs micrographic procedures are done for basal cell and squamous cell carcinoma, not for melanoma. (Dkt. 99 at ¶ 280). The Court is not persuaded that Dr. Harrist's opinion should be discredited on this basis—Dr. Harrist acknowledged that it was much more common for Mohs surgery to be performed on patients with basal cell and squamous cell carcinoma. (Dkt. 83 at 100).

Defendant further argues that Dr. Harrist's testimony should be discredited because of his representation that he participated in Mohs surgery. (Dkt. 99 at ¶¶ 272-80). Defendant relies on Dr. Goldenberg's testimony that dermatologists review slides themselves during the surgery. (Dkt. 99 at ¶ 279). However, Dr. Harrist acknowledged that most surgeons read their own slides and explained that his participation stemmed from a partnership with a dermatologist who did not like to read his own slides during surgery. (Dkt. 83 at 98-100). Dr. Harrist also noted that after he stopped working with that dermatologist, it has been "extremely rare" for him to read slides during surgery. (*Id.* at 98). Accordingly, the Court will not discredit Dr. Harrist's opinion on this basis.

Plaintiffs make a number of general challenges to Dr. Goldenberg's credibility, largely related to his familiarity with "the facts of Mr. Culhane's care and treatment." (Dkt. 102 at ¶¶ 46-51). However, the Court does not find that Dr. Goldenberg's unfamiliarity with certain details of Mr. Culhane's particular case renders his testimony unreliable as a whole or warrants a wholesale discrediting of his views. Dr. Goldenberg explained the

- 20 -

bases for his various opinions; the Court, as factfinder, will, to the extent necessary, consider the persuasiveness of those opinions, including the factual assumptions that underlie them.

Faced with competing testimony from two well-qualified experts, the Court turns to the specific opinions relevant to its resolution of Plaintiffs' claims.

### B.      Original Slide Interpretation

As to Mr. Culhane's malignant melanoma diagnosis, there is a material factual dispute as to whether Dr. Friedman misdiagnosed Mr. Culhane in April 2014 after reviewing the Original Slide.

Dr. Harrist disagreed with Dr. Friedman's diagnoses of focal early junctional nevus, and focal mild melanocytic atypia based on the Original Slide.  (*See* Dkt. 70 at ¶ 9).  In particular, Dr. Harrist opined that the diagnosis of "focal early junctional nevus" was incorrect (Dkt. 83 at 62:16-21, 67-71), and that it was "difficult for [him] to know" what Dr. Friedman meant by "focal mild melanocytic atypia."  Dr. Harrist explained that when observed on a slide, a nevus will have a "little nest of cells" like the nests seen on the Original Slide; however, the cells in a nevus are not atypical, whereas the nested cells on the Original Slide were atypical.  (*Id.* at 67:11-12).  He also noted that the dermatologist did not include "nevus" as a differential diagnosis, and cited several scientific studies to support the proposition that "there is, essentially, no way" a lesion fitting the description of Mr. Culhane's on a 70-year old individual "is just a junctional nevus."  (*Id.* at 68-70). Instead, Dr. Harrist diagnosed the Original Slide as "atypical intraepidermal and intrafollicular melanocytic proliferation consistent with lentigo maligna."  (*Id.* at 61:8-10).

Dr. Harrist discussed the reasons for this diagnosis, including his observation of "severe atypia of nests and a proliferation of melanocytes." (*Id.* at 79:17-18).

Dr. Goldenberg testified that he would not "quite call [the diagnosis], myself, a junctional nevus," but that it was "a stylistic thing." (Dkt. 95 at 101:9-10). Dr. Goldenberg opined that he would have diagnosed the biopsy "as a benign lesion with some atypia." (*Id.* at 34:16-17). He also stated that there was not enough present in the slide to diagnose an atypical intraepidermal and intrafollicular melanocytic proliferation (*id.* at 70:13-14), and that "you have to have many more melanocytes . . . to make that finding" (*id.* at 71:6-14; *see id.* at 68:15-20, 80:6-9).

The Court finds Dr. Harrist's opinion that Dr. Friedman incorrectly diagnosed Mr. Culhane with a junctional nevus more persuasive than Dr. Goldenberg's opinion to the contrary. At trial, Dr. Goldenberg stated that he had "stylistic" differences with Dr. Friedman about the diagnosis of focal early junctional nevus. (*See, e.g.*, Dkt. 95 at 101:9-10). However, during his deposition, Dr. Goldenberg testified that he "did not see a focal early junctional nevus per se." (Dkt. 95 at 102). Moreover, Dr. Friedman himself conceded during his testimony that he "most likely" misdiagnosed focal early junctional nevus on the Original Slide because he "didn't see enough findings really to justify diagnoses of junctional nevus." (Dkt. 79 at 178:20-25).

However, the Court disagrees with Plaintiffs' proposed conclusion that Dr. Friedman should have diagnosed Mr. Culhane with melanoma in situ based on the Original Slide. (*See* Dkt. 101 at ¶ 83 ("The slide that Dr. Friedman reviewed had enough evidence to determine that melanoma in situ existed in the remainder of the lesion); Dkt. 102 at

¶ 271) ("[A] work-up of the originally-viewed slide that met the standard of care would have yielded a diagnosis of lentigo maligna (melanoma in situ)").   In particular, the Court notes that Dr. Harrist did not testify that the Original Slide showed melanoma.   To the contrary, he testified that he was "not able to call it" lentigo maligna because he did not "have all the criteria."   (Dkt. 83 at 67-68).   Dr. Harrist further explained that the sample collected from the punch biopsy was "non-diagnostic" for lentigo maligna.   (*Id*. at 68, 119; *see also id*. at 132 ("One can only make the diagnosis of lentigo melanoma with certainty when one has the whole lesion to look at microscopically[.]")).   Further, while Dr. Harrist opined that the Original Slide was "consistent with lentigo maligna"  (Dkt. 83 at 61), he explained that in this context, "consistent with" means "you suspect that there is lentigo maligna elsewhere" (*id*. at 148).   In other words, Dr. Harrist's testimony was not that the Original Slide demonstrated that Mr. Culhane had melanoma in situ, but that it instead should have prompted further investigation.   (*See id*. (explaining that "consistent with lentigo maligna" means "I should do something to investigate it" and that "this is why . . . Dr. Friedman should have suggested a shave biopsy)).

Dr. Goldenberg confirmed that the Original Slide did not contain melanoma, explaining that "Dr. Friedman, appropriately, described some focal melanocytic atypia, but there is no finding of melanoma in this section.  It's just not here."  (Dkt. 95 at 68).  Dr. Goldenberg further persuasively explained that the Original Slide did not show atypical melanocytes in a row, as would be required to "make the diagnoses of an atypical intraepithelial or intramolecular melanocytic," but instead showed such melanocytes interspersed with keratinocytes, which is "a benign finding."  (*Id*.).  The Court did not find

persuasive Dr. Harrist's opposing testimony that the presence of "nests" of atypical melanocytes on the Original Slide meant it was "likely" that the biopsy was part of a lentigo maligna (Dkt. 83 at 67)—whereas Dr. Goldenberg gave clear, detailed reasoning based on the actual properties of the Original Slide for his conclusions, Dr. Harrist's testimony was more speculative and appeared to flow in significant part from his knowledge of the size of the lesion from which the sample had been taken. (*See id*. at 68 ("in my estimation, the punch biopsy, small sample contains an area of the melanocytic proliferation," thus making it likely "that somewhere else in this clinical lesion is overt melanoma in situ, lentigo maligna or even could be invasive melanoma")). As discussed further below, Dr. Friedman was not aware of the size of the lesion at the time he examined the Original Slide, and so lacked the factual basis to make the assumptions about what would be found in the larger sample that Dr. Harrist testified he should have requested. The Court thus concludes that the Original Slide would not have supported a diagnosis of melanoma, nor a diagnosis of "consistent with lentigo melanoma," and that Dr. Friedman did not err in failing to make such a diagnosis.

### C.   Whether Dr. Friedman Should Have Recommended a Shave Biopsy

The parties also dispute whether Dr. Friedman should have recommended further work-up in April 2014, including a shave biopsy. Dr. Harrist opined that Dr. Friedman should have recommended that a shave biopsy be done on Mr. Culhane's lesion. (*Id.* at 77:22-78:3). He testified that several studies have found "partial punch biopsies do not give adequate information in up to 85 percent of cases in making a diagnosis or are considered inappropriate" because of sampling. (*Id.* at 25:23-26:13). He also testified that

knowing the size of the lesion (1.8 by 2 centimeters), the size of the punch biopsy taken (4 millimeters), and the contents of the slide, "anything less than doing something more" fell below the standard of care. (*Id.* at 82:7-83:3).

Dr. Goldenberg opined that Dr. Friedman's conduct did not fall below the standard of care. He testified that Dr. Friedman did not need to review Mr. Culhane's chart to make his diagnosis because all the information Dr. Friedman needed was in the differential diagnosis made by the dermatologist. (Dkt. 95 at 36:14-37:17). Additionally, Dr. Goldenberg testified that Dr. Friedman was not required to have an interdepartmental or outside expert consultation of the Original Slide because it showed a benign lesion that was not "very, very difficult" to diagnose or something rarely seen. (*Id.* at 35:3-36:8). Dr. Goldenberg also represented that it was not necessary for Dr. Friedman to use additional stains on the specimen to make a diagnosis. (*Id.* at 37:24-38:8, 39:11-18). Dr. Goldenberg further opined that Dr. Friedman was not under an obligation to recommend a shave biopsy instead of a punch biopsy because there is no difference in diagnosis or prognosis between the two. (Dkt. 95 at 129:10-13). Dr. Goldenberg testified that pathologists usually do not dictate the types of biopsies that a dermatologist performs, especially when, as in this case, "[t]here is good clinical and pathological correlation between the differential diagnosis and the histologic findings." (*Id.* at 42:24-43:2). However, he also testified that he has made recommendations to a medical provider for additional sampling or biopsy. (Dkt. 95 at 120:13-16).

The Court does not find persuasive Dr. Harrist's opinion that Dr. Friedman's failure to recommend a shave biopsy fell below the standard of care. As noted above, Dr. Harrist's

opinion relies on his knowledge of the size of the lesion.  However, Dr. Friedman was not aware of the size of the lesion when he interpreted the Original Slide—the pathology report does not state how large the lesion was.  (*See* Pl. Ex. 23).  While that information was contained in Mr. Culhane's chart, Dr. Harrist did not offer an opinion regarding the standard of care for chart review, and Dr. Goldenberg persuasively testified that Dr. Friedman did not need to review Mr. Culhane's chart to make his diagnosis because all the information Dr. Friedman needed was in the differential diagnosis made by the dermatologist.  (Dkt. 95 at 36:14-37:17).  Because Dr. Friedman could not have known the size of Mr. Culhane's lesion without reviewing his chart, and Dr. Harrist did not establish that Dr. Friedman should have reviewed Mr. Culhane's chart, the Court is not persuaded by Dr. Harrist's opinion with regards to the shave biopsy recommendation.

Further, to the extent that Plaintiffs are contending Dr. Friedman was required to "have done additional sections or cuts into the block" in processing the biopsy, to have "used special stains for melanocytes to help him identify them," to have "gotten an intra-department review," or to have "sent the cast to an outside expert, such as a dermatopathologist" (Dkt. 102 at ¶ 308), the Court does not find that Plaintiffs have proved by a preponderance of the evidence that such actions were necessary to satisfy the appropriate standard of care.  Dr. Goldenberg provided clear reasons why Dr. Friedman was not required to take any of these additional steps in this case, and Plaintiffs did not come forward with meaningful evidence to the contrary.

IV.     **Mr. Culhane's Throat/Tonsil Cancer Diagnosis**

The parties presented two expert witnesses regarding Mr. Culhane's squamous cell tonsil cancer diagnosis to address whether the delay in diagnosis caused his recurrence and consequently necessitated surgery.  Plaintiffs rely on the testimony of Stuart Packer, M.D. ("Dr. Packer"), whereas Defendant relies on the testimony of Barry Wenig, M.D. ("Dr. Wenig").  The expert witnesses provided different opinions with respect to several material facts, including whether the 20-month delay in diagnosing Mr. Culhane's tonsil cancer caused his recurrence and the consequences of the recurrence.

A.     **General Challenges to Credibility of Experts**

Dr. Packer is board certified in the areas of oncology, internal medicine, and hematology.  (Dkt. 84 at 7:9-9:3).  He also worked as the Director of Medical Oncology at St. Mary's Regional Cancer Center, faculty at Memorial Sloan Kettering Cancer Center, head of thoracic and head and neck oncology at Mount Sinai School of Medicine, and presently serves as the Clinical Director of Medical Oncology at the Montefiore Einstein Cancer Center.  (*Id.* at 6:12-9:16).  Dr. Wenig is board certified in otolaryngology (study of the ear, nose, and throat) and head and neck surgery, treats one or two patients with squamous cell carcinoma per month, and is currently a Professor of Otolaryngology and Chairman of the Department of Otolaryngology at the University of Illinois College of Medicine in Chicago as well as the Director of the Division of Head and Neck Surgery and Robotic Surgery at the University of Illinois.  (Dkt. 96 at 3:25-6:24).  The Court again found both these experts to be credible and well-qualified.

Defendant argues that Dr. Wenig's experience is more relevant than Dr. Packer's because Dr. Packer "merely administers chemo-therapeutic drugs after somebody else has diagnosed the patient with cancer," whereas Dr. Wenig is a surgeon and "evaluates patients, makes diagnoses, and offers treatment to them."  (Dkt. 99 at ¶¶ 414-16).  However, there is no dispute over the evaluation and diagnosis of Mr. Culhane's squamous cell cancer: Defendant has conceded that the delay in diagnosis deviated from the standard of care, and Plaintiffs do not contend that the surgery and other treatments Mr. Culhane received after his diagnosis were improper.  Instead, the matter in dispute is whether the 20-month delay caused the recurrence in Mr. Culhane's throat cancer necessitating surgery in 2017.[5]  With regard to that issue, Dr. Packer's experience is relevant, as is reflected by his prior experience testifying as an expert witness.  When Dr. Packer has testified in court in his capacity as an oncologist, he has only addressed issues of causation (Dkt. 84 at 17-19), which is the matter presently before the Court.  The Court will not discount Dr. Packer's opinions on this basis.

Defendant further contends that Dr. Packer's opinion should be discredited because he was not aware of the difference between the left palatine tonsil and left tonsil.  (Dkt. 99 at ¶ 400; *see* Dkt. 84 at 15:24-25).  However, Dr. Packer showed extensive knowledge of relevant anatomy using demonstrative exhibits in Court (Dkt. 84 at 16-17), and in any event was called to present expert testimony on oropharyngeal cancers, not the specific technical terms for various portions of the throat.

---

[5]    Again, the parties agree that the chemotherapy and radiation would have been necessary to Mr. Culhane's treatment whether he was diagnosed in 2013 or in 2015.

Plaintiffs contend that the Court should find Dr. Wenig less credible because he is a former employee of the VA.  (Dkt. 102 at ¶ 27).  However, Dr. Wenig is not a current VA employee, and the Court does not find that his former association with the VA is a sufficient reason to conclude that he is generally unreliable or biased.

Having found no reason to favor the opinions of one expert over the other as a general matter, the Court will assess the opinions of each expert witness regarding the specific issues of material fact present in the instant matter.

### B.   Progression of the Cancer and Impact on Recurrence

It is undisputed in this case that Defendant did not cause Mr. Culhane's tonsil cancer and that he would have had to undergo chemotherapy and radiation even had he been properly diagnosed in 2013.  Instead, the key dispute is whether the 20-month delay in diagnosis is causally related to the subsequent recurrence and additional treatment it necessitated.

Plaintiffs contend that perineural invasion, also referred to as perineural involvement, developed as a result of the 20-month delay, thereby increasing Mr. Culhane's chance of recurrence.  Perineural invasion means that the cancer has invaded the space surrounding the nerves, and it is a negative prognostic factor because it is a risk factor for recurrence, and once perineural invasion has occurred, the cancer can "track" along the nerve to a different part of the body "like cars on the highway."  (Dkt. 94 at 31:15-32:8).[6] Perineural invasion is a pathological finding, meaning it can only be diagnosed by

---

[6]   These facts were testified to by Mr. Culhane's treating surgeon, Dr. Loree, and are undisputed.

surgically removing a specimen and examining it under a microscope.   (Dkt. 84 at 27:22-24; Dkt. 96 at 63:5-9).  There can be clinical signs that suggest perineural invasion, such as ear pain, also referred to as otalgia.  (Dkt. 84 at 25:6-16; Dkt. 96 at 63:10-14). Perineural invasion can cause otalgia by irritating or stimulating the ninth cranial nerve on the glossopharyngeal nerve.  (Dkt. 96 at 63:11-14; *see* Dkt. 84 at 79:5-10).

In the instant matter, Mr. Culhane's medical records show that Mr. Culhane complained of ear pain on April 30, 2015, but not on any other date.  (Ex. 400 at 941; *see, e.g.*, *id.* at 731, 932, 935, 954, 964, 992).  Two weeks later on May 15, 2015, Mr. Culhane went to the VA to have excess cerumen, or ear wax, flushed from his ear and was given antibiotics to clear up any infection.  (*Id.* at 935).  Mr. Culhane testified that the treatment he received for his ear resolved his ear pain.  (Dkt. 86 at 66:9-15).  Additionally, Dr. Packer testified that if Mr. Culhane's ear pain was a result of perineural invasion, he "would expect the pain to have been either intermittent or constant, not a single time."  (Dkt. 84 at 78:13-16).

Based on the above, the Court does not find persuasive Dr. Packer's opinion that there was clinical evidence of development of perineural invasion in April 2015.  The medical evidence of record discussed above makes it at least equally plausible that Mr. Culhane's ear pain was caused by excess ear wax, and Dr. Packer himself acknowledged that one complaint of ear pain, as opposed to consistent reports of ear pain, indicates that the pain was not caused by Mr. Culhane's tumor.  (*Id.* at 80:6-11).

However, the Court does find persuasive Dr. Packer's opinion that the amount of time between September 2013, when Mr. Culhane could have been diagnosed with

squamous cell carcinoma, and May 2015, when Mr. Culhane was diagnosed, caused the 2017 recurrence of his cancer.  (Dkt. 84 at 37:12-38:20).  Dr. Packer relied on several facts to arrive at this opinion.  He discussed that the size of Mr. Culhane's left level II lymph node increased by 86.3% by May 2015, nearly double its September 2013 size.  (*Id.* at 17:11-19:14).   The enlargement of the lymph node shows that Mr. Culhane's cancer progressed and that the number of cancer cells increased during the 20-month delay in diagnosis.  (*Id.* at 23:16-22).  Dr. Packer explained that cancer cells are abnormal cells in which there has been a mutation in one of the cell pathways.  (*Id.* at 13:10-12).  He also explained that every time a cancer cell divides there is a risk of another mutation, and that cancer becomes resistant to treatment when a cancer cell develops a mutation that makes it resistant, and then that resistant cell is cloned.  (*Id.* at 37:23-38:2).  Accordingly, Dr. Packer opined that the increase in the number of Mr. Culhane's cancer cells meant there was more cell division during those 20 months, which "allowed for more cell division with a greater likelihood of developing a mutation that resulted in a resistant mutation." (*Id.* at 38:2-5).

Also important, Dr. Packer noted, was that Mr. Culhane's recurrence happened in the area where he had received radiation treatment.  (*Id.* at 48:8-24).  If the cancer had recurred outside of the treatment area, it would have indicated that the initial treatment with chemotherapy and radiation was not adequate and missed some of the cancer.  (*Id.* at 48:16-19).  However, because Mr. Culhane's cancer came back "exactly" in the treatment area, "there clearly had to be resistant cells." (*Id.* at 48:20-24).  Additionally, although Dr. Packer acknowledged that if Mr. Culhane had been diagnosed with squamous cell

carcinoma in September 2013, statistically speaking he would have had a 15-20% chance of recurrence (*id.* at 82:2-9), Dr. Packer ruled out several potential causes of the recurrence in Mr. Culhane's case, such as the patient not complying with treatment or receiving the wrong treatment (*id.* at 37:15-21).

For the defense, Dr. Wenig opined that the growth of the lymph node did not impact Mr. Culhane's chance of survival because the increase in size was approximately 1.5 centimeters, a "minimal amount of growth." (Dkt. 96 at 19:7-14). He also relied on the fact that the type of tumor Mr. Culhane was diagnosed with, an HPV+ cancer, is "very, very slow growing" and has upwards of an 80% cure rate regardless of the stage. (*Id.* at 56:7-11). Additionally, Dr. Wenig testified that the change in volume of the Level II lymph node was irrelevant because the only dimensions used to stage cancer are length and width, and volume is not used to calculate treatment, prognosis, or outcome of head and neck cancers. (*Id.* at 19:21-20:4). However, Dr. Wenig did not opine as to what caused Mr. Culhane's recurrence. (*Id.* at 56:14-17).

The Court finds Dr. Packer's opinion to be more persuasive regarding the impact of the delay than that of Dr. Wenig. Dr. Wenig admitted the statistics he relies on do not account for the 20-month delay in diagnosis that Mr. Culhane experienced, nor could any statistical study do so because delaying treatment for 20 months would be unethical. (*Id.* at 79:7-11, 80:11-18). Additionally, Dr. Wenig did not dispute the logic behind Dr. Packer's opinion, *i.e.*, the longer cancer remains in the body dividing, the more likely it is that a resistant mutation will develop. To the contrary, Dr. Wenig testified that "[g]enerally speaking, the earlier you deal with a cancer . . . the greater the likelihood that you're going

- 32 -

to cure that patient." (Dkt. 96 at 82:18-20).  Nor did Dr. Wenig dispute that the cancer was growing during the 20-month period of delay.  Although he opined that Mr. Culhane's tonsil cancer was slow-growing, Dr. Wenig admitted that "eventually [the cancer is] going to spread somewhere" and that "no one can say with certainty what that eventual time frame is going to be." (Dkt. 96 at 55:4-6).  Moreover, Dr. Wenig was unable to render an opinion as to what did cause the recurrence in Mr. Culhane.  In other words, Dr. Wenig's opinion speaks in statistical generalizations that do not take into account the specific circumstances surrounding Mr. Culhane's tonsil cancer.  As Dr. Packer testified, "I always tell patients that . . . statistics don't really tell you about you[.]" (Dkt. 84 at 33:10-13).

Defendant criticizes Dr. Packer's opinion on the basis that his "theory is unsupported by medical literature." (Dkt. 103 at 10).  However, the principles described by Dr. Packer are "the theory behind the whole principle that you need early detection of cancer." (Dkt. 84 at 39:25-40:3).  In other words, Dr. Packer's "theory" is a fundamental tenet of cancer treatment.  As previously discussed, even Defendant's expert Dr. Wenig acknowledged that in general the sooner cancer is treated, the greater the likelihood of cure. (Dkt. 96 at 82:18-20).

Accordingly, the Court finds the opinion of Dr. Packer that the 20-month delay in diagnosis likely led to Mr. Culhane's tonsil cancer recurrence, more persuasive than the opinion of Dr. Wenig.

## C.   Consequences of the Recurrence

Dr. Packer opined that Mr. Culhane's prognosis is much worse because he has had a recurrence (Dkt. 84 at 45:9-11), mainly because he is more likely to have another

recurrence.  (*Id.* at 49:6-8).  Dr. Wenig also testified that because Mr. Culhane has had a recurrence, he is more likely to have another recurrence than someone who has not had an initial recurrence.  (Dkt. 96 at 118:16-119:6).  If that recurrence is metastatic and spreads to his lung, Dr. Packer opined that it would likely be incurable because the treatment has only a 9-12% response rate.  (Dkt. 84 at 49:14-16, 50:7-10).  If there is a recurrence in the oropharynx area, the only treatment would be re-radiation or proton treatment, which has about a 10% mortality rate.  (*Id.* at 49:16-20, 52:11-13).  If there is a recurrence in his larynx, he could have a surgical option.  (*Id.* at 52:10-11).  Dr. Wenig agreed that recurrences of cancer in the oropharynx have poorer outcomes than recurrences in the larynx, and more commonly metastasize to the lungs.  (Dkt. 96 at 73:19-25, 123:5-7).  Based on these opinions, the Court finds that it is more likely that Mr. Culhane will have another recurrence because he has already had a recurrence.

Further, the Court finds that if Mr. Culhane does have a second recurrence, it would increase the chances of him dying as a result of the cancer.  Dr. Packer testified that oncologists use two metrics to statistically measure survivability: progression-free survival and overall survival.  (Dkt. 84 at 33:14-34:8).  Overall survival refers to whether or not the patient is alive with the understanding that the cause of death may or may not be related to cancer, whereas progression-free survival is whether the patient is still alive and cancer-free.  (*Id.* at 33:16-22).  Doctors generally use five years as a benchmark for overall survival.  For squamous cell cancer, patients have a 99.9% chance of survival after the five-year clock runs (Dkt. 94 at 71:10), although little is known about survival rates after a recurrence (Dkt. 96 at 83:23-25).  Dr. Packer testified that Mr. Culhane's five-year

survivability clock reset when he had the recurrence.  (Dkt. 84 at 45:21-46:4).  Dr. Packer also testified that there are now recommendations that doctors follow patients with HPV positive cancer longer because they tend to have late relapses.  (*Id.* at 41:2-7).

Dr. Wenig opined that Mr. Culhane's five-year clock for survival did not reset in March 2017 when he had the surgery.  (Dkt. 96 at 66:25-68:13).  He testified that unlike other cancers, for head and neck cancer there is no concept of remission or disease-free survival; the patient is either cured or non-cured.  (*Id.* at 66:25-67:7).  If the patient is non-cured, there has either been persistence of the tumor or recurrence of the tumor.  (*Id.* at 67:7-8).  Dr. Wenig also opined that it is more likely than not that Mr. Culhane will not have another recurrence and that squamous cell carcinoma will not be the cause of Mr. Culhane's death because he believes that Mr. Culhane's "likelihood of cure is very, very high."  (*Id.* at 74:7-19).

The Court finds Dr. Packer's opinion regarding the five-year clock more persuasive than that of Dr. Wenig.  Dr. Wenig did not provide a meaningful explanation as to why the five-year clock calculation is different for head and neck cancer as opposed to other cancers.  Additionally, Dr. Wenig's statement that Mr. Culhane is more likely to have a second recurrence because he had an initial recurrence, as compared to an individual with no recurrence, undercuts his opinion that a recurrence has no effect on the five-year survival clock.  Moreover, Dr. Loree, Mr. Culhane's treating physician for the tonsil cancer, testified that the five years begins from the end of treatment, which in this case would be from the date of Mr. Culhane's surgery— March 23, 2017 (Dkt. 94 at 71:13-21)—corroborating Dr. Packer's opinion.

Accordingly, the Court credits the opinion of Dr. Packer finds that Mr. Culhane's five-year survival clock will not run until March 23, 2022.

## V.     Impact on Plaintiffs

### A.     Credibility

The vast majority of the damages claimed by Plaintiffs are related to Mr. Culhane's recurrence of squamous cell carcinoma and the effects of the throat surgery he had to undergo as a result of the recurrence.  The case for what damages Plaintiffs suffered hinges on the credibility of various factual witnesses, including Mr. Culhane, Mrs. Culhane, Robin Kiggins, Robert St. John, Tom Wilcox, Dr. Loree, Dr. Brown, and Dr. Thompson.  The parties do not contest the credibility of Mr. St. John, Mr. Wilcox, Dr. Loree, Dr. Brown, or Dr. Thompson, and the Court also found their testimony to be credible.[7]  With regards to Mr. Culhane, Mrs. Culhane, and Robin Kiggins, the Court assesses the credibility of each witness in turn based on its observations at trial, including the demeanor and conduct of the witness, as well as the consistency of the witness's testimony with the testimony of other witnesses and evidence of record.

### 1.     Mr. Culhane

The Court found Mr. Culhane to be a credible witness.  His testimony was generally consistent with the medical evidence of record.  For example, he testified at trial that he was not currently experiencing pain although he was experiencing discomfort (Dkt. 86 at

---

[7]     Mr. St. John is a friend of Mr. and Mrs. Culhane who attends a coffee club with Mr. Culhane three to four times per week.  (Dkt. 89 at 175).  Mr. Wilcox is also a member of the coffee club and a close friend of Mr. Culhane, having described their relationship as "[l]ike brothers."  (*Id*. at 191).

151:13-16), which comports with his reports of a pain score of zero to Dr. Thompson beginning in September 2017 after his surgery (Def. Ex. 400 at 3483, 4173, 4461, 4809, and 4885). Additionally, Mr. Culhane acknowledged that at least some of the difficulties he encountered were a result of the chemotherapy and radiation before the surgery, including difficulty swallowing due to lack of saliva, his loss of sense of taste and smell, as well as at least a portion of his low energy levels. (Dkt. 86 at 76:15-22, 81:14-23, 137:11-14). In other words, Mr. Culhane did not appear to exaggerate his symptoms.

Defendant points out that Mr. Culhane did not cough when he testified before this Court even though he claims to cough more frequently than before the surgery. (Dkt. 86 at 157:13-17). However, Mr. Culhane claimed the primary reason for his coughing is if he tries to swallow while talking, such as during a meal (*id.* at 41:24-42:4, 152:2-3), and Mr. Culhane certainly was not eating during his testimony. In any event, it is entirely possible that he avoided swallowing and talking at the same time throughout the course of his testimony, and the Court does not believe that his lack of coughing while testifying negates the credibility of Mr. Culhane's testimony. After considering the totality of Mr. Culhane's testimony as discussed above, as well as his demeanor, the Court finds him to be a generally credible witness.

### 2.    **Mrs. Culhane**

In assessing Mrs. Culhane's credibility, the Court found her testimony to be more characteristic of an advocate for her husband than that of an objective observer. The Court found that Mrs. Culhane tended to exaggerate Mr. Culhane's symptoms. For example, she characterized her husband as "withering away" (Dkt. 77 at 135:25), although she admitted

Mr. Culhane has regained the weight he lost as a result of the cancer treatments (*id.* at 190:21-23; *see also* Dkt. 86 at 51:21-22).  Additionally, Mrs. Culhane did not acknowledge that the tongue sores Mr. Culhane has developed occasionally since 2015 have always self-resolved (Dkt. 77 at 166:13-17), even though Mr. Culhane testified that they have all self-resolved (Dkt. 86 at 85:9-11), and the notes of Mr. Culhane's treating physician Dr. Loree also say as much (*see* Def. Ex. 401 at 4472).

Plaintiffs contend that "Mrs. Culhane was right to disagree with [defense] counsel that these sores always self-resolve within a few days" because "the sore that Mr. Culhane developed during the holiday season of 2019 was still present when he testified on February 18, 2020."  (Dkt. 105 at ¶ 107).  However, Mrs. Culhane's testimony went further—she claimed that the sores on his tongue "don't heal" in reference to all of the sores, not just the one sore from the 2019 holiday season (Dkt. 77 at 166:8-17), which does not comport with the rest of the evidence of record.

To be clear, the Court does not by any means believe that Mrs. Culhane was intentionally deceitful.  Rather, considering the difficulties Plaintiffs have undergone over the past five years, the Court concludes that Mrs. Culhane's protectiveness that she understandably feels for her husband manifested itself as exaggeration.  But as a result, the Court finds that she was not a reliable reporter—she did not testify objectively regarding Mr. Culhane's symptoms and therefore the Court does not credit those portions of her testimony.[8]

---

[8]     Defendant also contends that Mrs. Culhane "minimized the role that Mr. Culhane played in helping her through her bout with skin cancer" even though she represented to

On the other hand, the Court does find Mrs. Culhane's testimony about how Mr. Culhane's treatment and surgery impacted her own life was not exaggerated.  In other words, the factors that caused the Court to conclude that it could not rely on Mrs. Culhane's testimony concerning Mr. Culhane's conditions, did not similarly impact the Court's view as to the reliability of her testimony concerning the impact on her own situation.  Therefore, the Court credits Mrs. Culhane's testimony as it pertains to her injuries.

### 3.    <u>Robin Kiggins</u>

The Court also finds for similar reasons that the testimony of Robin Kiggins—Mr. Culhane's stepdaughter and Mrs. Culhane's daughter—regarding Mr. Culhane was exaggerated.  For example, she testified that Mr. Culhane does not hunt anymore because it is too much for him (Dkt. 79 at 264:10-14), even though Mr. Culhane testified that he hunts with about as much frequency now as before the surgery (Dkt. 86 at 140:9-12), as did his friend Mr. St. John (Dkt. 85 at 906:5-12, 908:24-909:3).  Again, as a loving stepdaughter, Ms. Kiggins appeared to be acting as an advocate for Mr. Culhane rather than an objective observer. As a result, the Court does not credit the uncorroborated statements made by Ms. Kiggins regarding Mr. Culhane's symptoms.  However, the Court did not find Ms. Kiggins' testimony about the impacts on Mrs. Culhane to be exaggerated, nor does Defendant dispute the accuracy of those statements.  Therefore, the Court credits Ms. Kiggins' testimony as it pertains to Mrs. Culhane's injuries.

---

their primary care physician Dr. Thompson that "Gerry is my Carol now."  (Dkt. 99 at ¶ 655; *see* Dkt. 77 at 195:17-20).  However, the Court does not find Defendant's emphasis on this statement persuasive, as Mrs. Culhane reasonably explained that it was an effort to give Mr. Culhane "kudos" for the little help he could provide.  (Dkt. 77 at 210:4-9).

### B.   Material Facts Underlying Plaintiffs' Damages Claims

#### 1.   General Background

Mr. Culhane is almost 77 years old (Dkt. 86 at 4:7), and Mrs. Culhane is 72 years old (Dkt. 77 at 47:3).  They were married on January 2, 1989.  (*Id.* at 8:15-17).

#### 2.   March 23, 2017 Surgery

On March 23, 2017, Mr. Culhane underwent a radical tonsillectomy and a left modified neck dissection under general anesthesia, performed by Dr. Loree at ECMC. (Dkt. 70 at ¶ 59).  While the surgical procedure usually takes Dr. Loree three to four hours (Dkt. 94 at 28:24-25), Mr. Culhane's surgical procedure took five hours and two minutes (Pl. Ex. 95 at 1476).  Dr. Packer described this type of surgery as "morbid."  (Dkt. 84 at 100:18-19).

The first phase of the surgery was a per oral radical tonsillectomy.  (Pl. Ex. 95 at 1503-04).  The left tonsillar fossa was infiltrated with Marcaine and epinephrine, the tonsil was grasped and retracted, then a circumferential incision was made through the mucosa of the entire tonsillar fossa.  (*Id.*).  The incision line was through the posterior left oropharyngeal wall, including a portion of the base of the left tongue.  (*Id.*).  The pharyngeal wall musculature was deeply resected, with cautery used to contain the blood flow.  (*Id.*).  The large specimen was then sent to pathology.  (*Id.*).  Scissors were then used to obtain five additional specimens from the oropharyngeal margins.  (*Id.*).  These were sent to pathology and reported as "no tumor seen."  (*Id.*).  The second part of the surgery was the left modified radical neck dissection to remove lymph nodes in Mr. Culhane's neck.  (*Id.* at 1304).  The lymph nodes were removed from the middle portion of the neck

to the mandibular border, the border of the jaw, to the trapezius muscle in the back and down to the level of the collarbone and clavicle, and all of the tissue was removed. (*Id.* at 1304-05).

During the course of the procedure, Dr. Loree cut the omohyoid muscle, internal jugular vein, lymphatic structures, the cervical fascia, the facial artery and vein, the parotid tail tissues, the posterior facial vein, the digastric muscle, the mylohyoid muscle, the lingual nerve, the submandibular glad duct and posterior facial artery, the digastric muscle triangle, and the anterior jugular vein branches. (*Id.* at 1303-05). Dr. Loree removed "[t]he junction between the tonsillar fossa and the tongue and the base of the tongue, the back of the tongue." (Dkt. 94 at 24:21-23). Additionally, Dr. Loree saved the spinal accessory nerve, the stemocleidomastoid muscle, the internal jugular vein, and the sensory and motor roots of the C2, C3 and C4. (*Id.* at 27:2-5). The stemocleidomastoid muscle is the largest strap muscle and helps a person turn the neck. (*Id.* at 27:6-10). The internal jugular vein drains the blood from the brain into the neck. (*Id.* at 27:11-13). By saving the nerves, Dr. Loree preserved Mr. Culhane's sensation in the neck and allowed Mr. Culhane to have better range of motion in his neck. (*Id.* at 27:15-18).

The March 23, 2017 surgery successfully removed all of the gross disease in Mr. Culhane. (*Id.* at 61:8-11). The pathology report after Mr. Culhane's surgery revealed that the margins of the surgical site were negative for cancer. (Pl. Ex. 50; Dkt. 94 at 31:4-6). One out of the ten lymph nodes showed metastatic squamous cell cancer, which is a negative prognostic factor (Pl. Ex. 50; Dkt. 94 at 31:4-6, 32:15-16), although no extracapsular extension was identified on the lymph node, which is a positive prognostic

factor (Pl. Ex. 50; Dkt. 94 at 32:16-18).   Perineural involvement was also present in the specimen, which is a negative prognostic factor.   (Pl. Ex. 50; Dkt. 94 at 31:10-20).

### 3.      Mr. Culhane's Pain Immediately After Surgery

The surgery caused Mr. Culhane to experience pain in the days, weeks, and months after the procedure.   Dr. Loree testified that "[a] tonsillectomy in an adult is an extremely painful procedure" because "[i]t's a raw surface . . . [and] you don't close the wound, so the internal tissues are exposed and that is extremely painful."   (Dkt. 94 at 44:15-21). Although Mr. Culhane was placed under general anesthesia, anesthetics only "[m]ake[] the pain less intense for a brief period of time."   (*Id.* at 61:18-24).

The day after the surgery, March 24, 2017, Mr. Culhane experienced significant pain, dysphagia, urinary hesitancy, urinary retention, soreness of his left jaw, sore throat, left marginal mandibular weakness, and facial drooping.   (Pl. Ex. 95 at 1538; Def. Ex. 400 at 1877).   On March 25, 2017, Mr. Culhane required medication for pain. (Pl. Ex. 95 at 1538).   On March 26, 2017, Mr. Culhane had issues with pain and sleeping through the night.   (*Id.*).  He was medicated with Benadryl (an antihistamine sometimes used for insomnia) and Toradol (a very strong NSAID used for moderate-to-severe pain, especially post-operatively).   (*Id.*).   In the early morning of March 27, 2017, Mr. Culhane reported that his pain increased and he became short of breath when coughing.   (*Id.*).   On the afternoon of March 27, 2017, Mr. Culhane reported that his pain was not controlled.   (*Id.* at 1537).   His pain medications were adjusted, and he received a one-time dose of Toradol. (*Id.*).   On the morning of March 28, 2017, Mr. Culhane experienced uncontrolled pain and a feeling of increased swelling in his throat.   (*Id.* at 1537-38).   His pain was not controlled

- 42 -

with the medication that he had been prescribed.  (*Id.*).  He and Mrs. Culhane reported that he had increased pain and a decreased ability to swallow.  (*Id.*).  Mr. Culhane's Percocet (oxycodone plus acetaminophen) was increased, and his medication was then changed to Tramadol (a narcotic-like pain reliever for moderate-to-severe pain).  (*Id.*).  Mrs. Culhane called to say that she was not comfortable taking her husband home in his current condition. (*Id.*).

On March 29, 2017, Mr. Culhane complained of difficulty swallowing and coughing when he swallowed.  (*Id.* at 1532-37).  This caused throat pain.  (*Id.*).  He continued to complain of increased pain, and he was given Percocet and Naproxen (narcotic and anti-inflammatory drugs, respectively).  (*Id.*).  He also required viscous lidocaine and milk of magnesia for throat pain.  (*Id.*).  On March 30, 2017, Mr. Culhane continued to experience a burning sensation when swallowing.  (*Id.* at 1534).  He coughed every time he swallowed, which caused throat pain.  (*Id.*).  Mr. Culhane experienced some improvement in his pain levels after taking medication, but the relief lasted less than three hours.  (*Id.*).  Mr. Culhane was supposed to stay in the hospital for only three days after the surgery, but he ended up staying in the hospital for seven days because the pain made him unable to swallow.  (Dkt. 86 at 43:23-44:3).  Mr. Culhane required high doses of pain medication, which took away only some of his pain.  (*Id.* at 44:13-16).  Additionally, Dr. Loree testified that Mr. Culhane's pain was not well-controlled after the surgery.  (Dkt. 94 at 63:19-20).

Defendant attempts to discredit the evidence of record regarding Mr. Culhane's pain during his stay at ECMC the week after the surgery by pointing to three portions of the medical record where Mr. Culhane's pain was noted as "well-controlled."  (Dkt. 99 at

¶¶ 383, 385-86).  However, Defendant does not refute any of the evidence in the medical records as described above, including that Mr. Culhane's hospital stay was extended due to his pain.  Additionally, the Court finds persuasive the testimony of both Mr. Culhane and Dr. Loree that the pain was not well-controlled during Mr. Culhane's week-long stay at ECMC after the surgery.

Mr. Culhane was also in pain due to the surgery for at least ten weeks after his discharge from the hospital.  On April 3, 2017, when Mr. Culhane was discharged from the hospital, Dr. Loree prescribed Fentanyl patches to control Mr. Culhane's pain.  (Pl. Ex. 95 at 1788).  Dr. Loree described Fentanyl as "[p]robably the most powerful narcotic available."  (Dkt. 94 at 40:21).  On April 10, 2017, Mr. Culhane's medical records note that his current pain medication, Fentanyl 50 mcg/hr, did not last a full 48 hours, so he supplemented it with 15 mg of oxycodone every 4 hours.  (Pl. Ex. 95 at 1790).  It was also noted that Mr. Culhane "[h]as significant pain when he tries to swallow."  (Id.).  Mr. Culhane's Fentanyl patch prescription was increased to 75 mcg/hr every 72 hours, and his oxycodone dose was increased by 50%.  (Id.).

On April 26, 2017, Mr. Culhane had a telephonic appointment with his primary physician, Dr. Thompson.  (Def. Ex. 400 at 1866-67).  Dr. Thompson noted that Mr. Culhane represented his pain control was adequate, but also that he had lost 15-20 pounds since his surgery.  (Id.).  She referred Mr. Culhane to a palliative care doctor to help manage his symptoms in part because he was "having a lot of difficulty post operatively with managing pain."  (Dkt. 85 at 54:9-11).  On April 27, 2017, Mr. Culhane saw Rashmi Dmello, M.D., in a palliative care consult for symptom management.  (Def. Ex. 400 at

1817-23).  Mr. Culhane complained of constipation, nausea, pain, lack of energy, difficulty sleeping, and a weight loss of 20 pounds since the surgery.  (*Id.*).  His Fentanyl patch was increased to every 48 hours, and his oxycodone was changed to be taken as needed for breakthrough pain.  (*Id.*).

On May 8, 2017, Mr. Culhane saw Dr. Patterson, who noted that Mr. Culhane was having trouble recovering from the March 2017 surgery, primarily from ongoing pain.  (*Id.* at 1810-11).  Mr. Culhane saw Dr. Loree on May 9, 2017, for a follow-up appointment, and Dr. Loree noted that Mr. Culhane "[h]ad significant pain control issues" and that he was "[f]ollowing with palliative care at Veterans Administration Hospital who is managing that for him."  (Pl. Ex. 95 at 1792).  On June 19, 2017, Mr. Culhane again saw Dr. Loree for a postoperative follow-up appointment.  (Pl. Ex. 95 at 1798-1801).  Dr. Loree noted that Mr. Culhane had significant pain control issues from the surgery.  (*Id.*).

In June, Mr. Culhane decided he wanted to go off the pain medications, so he stopped taking them.  This caused him to experience withdrawal symptoms: staying up all night and pacing up and down the driveway.  (Dkt. 85 at 50:21-24; Dkt. 86 at 46:4-10).  The medications first had to be increased to counteract withdrawal symptoms, and then they were tapered down slowly.  (Dkt. 85 at 50:25-51:2).

### 4.    **Mr. Culhane's Present Physical State**

Mr. Culhane testified that on a day-to-day basis, he experiences constant discomfort but not what he would consider pain.  (Dkt. 86 at 151:13-16).  Mr. Culhane also reported pain scores of zero out of ten to Dr. Thompson on June 13, 2017, January 30, 2018, March 21, 2019, September 26, 2018, March 26, 2019, and September 30, 2019, as well as a pain

score of one on September 19, 2017.  (Def. Ex. 400 at 1827-28, 3483, 4173, 4161, 4809, 4885; Def. Ex. 486 at 5115).

Some of this discomfort can be attributed to neck stiffness.  Mr. Culhane's neck is stiff and he must turn his whole body to look to the side.  (Dkt. 86 at 151:17-23).  Mr. Culhane testified that this stiffness is a result of the surgery (*id.*), which is supported by his medical records (*see* Pl. Ex. 95 at 1792 (May 9, 2017 medical record from Dr. Loree noting that Mr. Culhane had begun having "stiffness and pain in neck postoperatively"); *id.* at 1798-1801 (June 19, 2017 medical record from Dr. Loree noting that Mr. Culhane continued to have some limited range of motion in the upper extremity related to the neck dissection); Def. Ex. 400 at 4783 (March 26, 2019 medical record from Dr. Thompson noting she prescribed a Flexitouch device to Mr. Culhane and recommended acupuncture and physical therapy to help with neck stiffness)).

More recently, on December 5, 2019, Mr. Culhane consulted with an acupuncturist to whom he was referred by Dr. Thompson.  (Def. Ex. 487 at 5150).  His chief complaint for this visit was chronic neck pain and stiffness throughout the neck, "though more so on the left in the region of the surgery."  (*Id.*).  He also complained of intermittent muscle cramping with rotation of the neck, opening of the jaw, chewing, or at other random times.  (*Id.*).  Mr. Culhane also reported stiffness or tightness in the upper trapezius and some areas of numbness around the left anterolateral cervical region.  (*Id.*).  Additionally, on January 8, 2020, Mr. Culhane had a physical therapy consultation where he complained of pain in his neck of about 2-3 out of 10, but his chief complaint was tightness and cramping on the left side of his neck.  (*Id.* at 5144).

Mr. Culhane also testified that he felt increased tightness in his throat after the surgery that made it more difficult to swallow.  He acknowledged that swallowing was difficult before the surgery because the chemotherapy and radiation treatment caused him to produce less saliva.  (Dkt. 86 at 80:23-81:2).  He also acknowledged that he stopped enjoying meals after the chemotherapy and radiation because of the lack of saliva as well as his loss of taste and smell.  (*Id.* at 81:5-10).  Even considering these difficulties caused by the chemotherapy and radiation, Mr. Culhane testified that swallowing is more difficult after the throat surgery (*id.* at 81:11-13).

Dr. Loree testified that "surgery doesn't [a]ffect swallowing in most people," although he also acknowledged that "everybody is different" and that "[h]aving the surgery and the scar tissue forming . . . does not improve swallowing function."  (Dkt. 94 at 52:12-13, 54:11-12).  Additionally, Dr. Loree testified that over 60% of patients who undergo radiation treatment develop a narrowing in the back of the throat, and the narrowing can happen any time after the radiotherapy, even up to 20 years later.  (*Id.* at 51:17-52:3).

Mr. Culhane's medical records reflect that he complained of dryness of the mouth before his surgery.  (*See, e.g.*, Pl. Ex. 95 at 1431, 1436; Def. Ex. 400 at 680-83, 730, 806-09).  On March 28, 2017, days after undergoing the head and neck surgery, the medical records reflect that Mr. Culhane reported difficulty swallowing.  (Pl. Ex. 95 at 1536-37).  On May 12, 2017, Mr. Culhane underwent a barium swallow study to evaluate his ability to swallow.  (Def. Ex. 400 at 1788-89, 1810-11, 1847-50).  The study revealed moderate to severe pharyngeal dysphagia (the medical term for difficulty swallowing), and noted the

prognosis for improvement in Mr. Culhane's swallowing was "guarded given that chemo/radiation was completed in 2015 and fibrosis 2/2 XRT [radiation therapy] is likely a contributing factor to patient's dysphagia," as well as that Mr. Culhane "is healing from left modified neck dissection and some improvement in swallow is expected as he heals and any edema diminishes". (*Id.* at 1844-45, 1848-49).

Dr. Thompson stated that after the surgery Mr. Culhane had a "tight feeling in his throat that made it more uncomfortable to swallow." (Dkt. 84 at 170:25-171:3). To swallow, Mr. Culhane must put his head down and tip it to the left. (Dkt. 86 at 39:18-19). He cannot talk or look up when eating and swallowing, and if he is not careful or does not swallow in this position he chokes on food or drink. (*Id.* at 39:21-23). He is limited to eating things with the consistency of a sauce or gravy, and he must eat very little and very slowly. (*Id.* at 40:13-14; Def. Ex. 400 at 1843-44). Additionally, before the surgery but after the chemotherapy and radiation treatment, Mr. Wilcox saw Mr. Culhane eating at the coffee club they attended; however, after the surgery, Mr. Wilcox "never saw him eat." (Dkt. 85 at 208:24-209:2). On August 12, 2019, and September 30, 2019, Dr. Loree listed dysphagia as an active problem for Mr. Culhane. (Pl. Ex. 95 at 1965, 1975). Mr. Culhane must be careful with swallowing because if food or pills go down his trachea instead of his esophagus, he could get aspiration pneumonia. (Dkt. 94 at 53:11-21).

Since the head and neck surgery, Mr. Culhane's tongue is crooked and lies against the left side of his cheek all the time. (Dkt. 86 at 37:13-38:4; Def. Ex. 400 at 4960 (June 10, 2019, medical record from Dr. Loree noting that Mr. Culhane has "tongue swelling and movement of tongue to the left)). Dr. Loree testified that the deviation could either be

caused by nerve damage from the radiotherapy or tethering from the scar tissue from the surgery (Dkt. 94 at 49:14-22), but as previously noted the tongue deviation did not occur until after the surgery. Additionally, Mr. Culhane's lip folds in when he opens his mouth (*id.* at 37:23-24), and whenever he opens his mouth widely, it causes momentary cramps in his jaw (*id.* at 39:2-11). His tongue in particular impacts his speech. (*Id.* at 37:23-24).

Additionally, as early as May 8, 2017, Mr. Culhane's palliative care specialist Dr. Calkins recorded limitations in Mr. Culhane's shoulder that had appeared since his head and neck surgery: he was unable to flex his shoulder independently more than 70 degrees. (Def. Ex. 400 at 1852-53). Dr. Loree also noted on May 9, 2017, that Mr. Culhane had begun having "stiffness and pain in neck postoperatively as well as limited range of motion of the left arm." (Pl. Ex. 95 at 1792). On May 31, 2017, Mr. Culhane had physical therapy for his left shoulder pain, where he reported that he "[h]ad lymph nodes removed on L side of [shoulder]/neck" and "[h]ad previous problems [with his shoulder] but is currently worse. . . . States [shoulder] is not as functional as it was prior to surgery." (Def. Ex. 400 at 1841). On June 19, 2017, at a post-operative follow-up appointment, Dr. Loree noted that Mr. Culhane had limited range of motion in his arms as well as that Mr. Culhane had a previous longstanding shoulder injury and has had shoulder surgery recommended to him in the past. (Pl. Ex. 95 at 1798-1801). In an orthopedic consultation on September 26, 2017, Sean Metz, PA-C, recorded that Mr. Culhane experienced left shoulder pain that had been worse since his radical neck dissection. (Def. Ex. 400 at 3482) Mr. Culhane had shoulder replacement surgery on January 18, 2018. (*Id.* at 4267).

### 5.    Mr. Culhane's Present Stamina

After the chemotherapy and radiation treatment, Mr. Culhane's medical records indicate that he experienced "general fatigue" and "was feeling kind of rung out and tired." (Def. Ex. 400 at 695 (Dr. Thompson's treatment notes from June 14, 2016); Dkt. 85 at 112:5-8)).  Experiencing fatigue after chemotherapy and radiation is "the norm."  (Dkt. 85 at 112:9-11).  Mr. St. John also testified that Mr. Culhane's energy levels never fully went back to normal after the chemotherapy and radiation treatment, although he seemed to recover somewhat before the surgery.  (Dkt. 85 at 181:22-25, 183:19-20).  Additionally, Mr. Culhane testified that his energy level after his initial treatment "was less than what it was before my original cancer treatment" (Dkt. 86 at 135:7-8), and that the low energy level he presently experiences is partially due to the 2015 chemotherapy and radiation treatment (*id.* at 137:11-14).

Since his treatment, Mr. Culhane is less physically active.  He and Mrs. Culhane own a 184-acre plot of land (the "Land") which requires a lot of maintenance, including maintaining a half-acre garden, cutting firewood for the wood-burning furnace, mowing the farm, and clearing brush in the woods.  (Dkt. 86 at 10:24-13:25, 17:9-11).  Before the tonsil cancer diagnosis, Mr. Culhane was able to perform all of these tasks.  (*Id.* at 17:9-23; Dkt. 85 at 177:4-7, 195:20-23).  Although he had some back pain and shoulder issues prior to his cancer treatment, his back treatment ended in 2012 and caused him to be more careful but did not limit his activities.  (Dkt. 86 at 17:14-23; *see* Dkt. 85 at 167:3-8).  Presently, after undergoing his cancer treatments, he has hired a man with a wood processor to split wood for heat, and he struggles to use or service machines like a tractor.  (Dkt. 86 at

47:21-48:4; Dkt. 85 at 203:25-204:6).  He rides an ATV on the property where he used to walk.  (Dkt. 79 at 49:23-50:5).  He is not as agile as he used to be on ladders or tree stands. (*Id.* at 47:21-24; Dkt. 86 at 48:20-22).  Mr. Culhane does not enjoy hunting as much as before his diagnosis because he coughs a lot and has to move to sip water, which scares off the deer.  (Dkt. 86 at 149:3-8).

At least some of Mr. Culhane's physical decline occurred after the surgery.  (*See* Dkt. 85 at 205:4-15).  In September 2016, after the chemotherapy and radiation, Mr. Culhane could mow the farm and chop firewood to get ready for winter.  (Dkt. 86 at 32:12-16).  After the surgery, Mr. Culhane could no longer chop firewood and could only mow portions of the farm on a less regular basis.  (Dkt. 85 at 183:19-184:6).  Additionally, Mr. Culhane is no longer able to maintain the half-acre garden that he was able to before the surgery.  (Dkt. 86 at 49:10-16).  The inability to maintain the Land means the Culhanes must sell it sooner than they intended, although there always would have come a time when the Land would have become difficult or impossible to maintain.  (*Id.* at 132:13-134:5). Presently, Mrs. Culhane lives at a lake house purchased by her son while Mr. Culhane stays on the Land to feed wood into the furnace during winter.  (Dkt. 77 at 64:13-22).

The medical records do not reflect abnormalities in Mr. Culhane's gait, nor has Dr. Thompson observed that Mr. Culhane is unsteady.  (*See* Def. Ex. 400 at 1830, 4175, 4461, 4887; Dkt. 85 at 162:13-21).  Although Dr. Thompson has not seen Mr. Culhane on the Land (Dkt. 85 at 165:16-21), her observations support that Mr. Culhane's gait was not seriously impacted by the surgery.

Defendant points out that Mr. Culhane assisted Mrs. Culhane during her own bout of skin cancer; however, the tasks performed by Mr. Culhane, while physical, were not strenuous: he changed Mrs. Culhane's bandages, bent over to pick things up for her, and did the grocery shopping. (Dkt. 86 at 131:2-18). Ms. Kiggins provided the other care that Mr. and Mrs. Culhane required. (Dkt. 79 at 52:14-53:10). Defendant also notes that Mr. Culhane has developed hypothyroidism, which causes fatigue. (Def. Ex. 400 at 697; Dkt. 85 at 113:22-114:12). While hypothyroidism is often caused by radiation in the neck and can also be caused by Agent Orange, both of which Mr. Culhane was exposed to (Def. Ex. 400 at 697; Dkt. 85 at 114:11-16, 149:21-24), Mr. Culhane's hypothyroidism only developed in the last year—two years after his surgery—and has since been corrected (Dkt. 85 at 114:11-12, 159:7-8). In other words, while hypothyroidism may account for some of the decline in physical stamina that Mr. Culhane has experienced after his surgery, it does not account for all of it.

Overall, based on all of the above, while a significant portion of Mr. Culhane's decline in physical ability was caused by his 2015 chemotherapy and radiation treatment as well as the normal aging process for a 76-year-old man, at least some of that decline can be attributed to the 2017 surgery.

### 6. Mr. Culhane's Mental Health and Cognition

The recurrence of the cancer has impacted Mr. Culhane's mental health. Mr. Culhane's greatest fear is that the cancer will return because he has been told that he probably will not recover from it. (Dkt. 86 at 143:19-23). The cancer is on his mind "all of the time . . . so it cuts into any type of normal life." (*Id.* at 52:4-6).

Since the 2017 surgery, there have been several times that Plaintiffs feared the cancer had returned.  From January 29, 2018, to June 21, 2018, Plaintiffs were concerned about another potential recurrence because of a growth on Mr. Culhane's vocal chords that was biopsied.  (Pl. Ex. 95 at 1808–15, 1817-19; Def. Ex. 400 at 4150-51, 4160, 4166-68, 4177, 4182-84, 4359-60; Dkt. 86 at 145:24-147:3).  From August 6, 2019, to September 30, 2019, Mr. Culhane was concerned about two sores on the back of his tongue on the side that previously had cancer (Pl. Ex. 95 at 1965, 1968, 1970; Def. Ex. 400 at 4921, 4857-58; Dkt. 86 at 53:2-8; Dkt. 94 at 55:12-22), and over the 2019 holiday season Mr. Culhane was concerned about another new sore on his tongue (Dkt. 86 at 998:7-19; Dkt. 94 at 59:5-10).

The psychological impact the recurrence had on Mr. Culhane manifests in several ways.  He checks the back of his tongue every time he goes to the bathroom to make sure it looks the same and that it is not bleeding because he is concerned about the cancer coming back.  (*Id.* at 53:22-25, 147:15-19).  Additionally, Mr. Culhane lost at least four pounds between September 30, 2019, and January 6, 2020 (Pl. Ex. 95 at 1971; Pl. Ex. 138 at 3), even though Dr. Thompson testified that Mr. Culhane typically gains weight in the wintertime. (Dkt. 85 at 145:24-25).  Throughout this time period, Mr. Culhane expressed concern about another cancer recurrence on several occasions.  (*See* Dkt. 86 at 52:21-23 (testimony by Mr. Culhane: "I was pretty worried."); Dkt. 85 at 94:24-95:7 (testimony by Dr. Thompson: "I think for any patient that has had cancer, there is always that lingering fear."); Dkt. 94 at 45:6-7 (testimony by Dr. Loree: "[O]n his recent visit, he was concerned about the possibility of new cancer on his tongue.")).

Others have also observed signs of mental distress in Mr. Culhane.  Mr. Wilcox testified that after the recurrence, Mr. Culhane "was even more secluded, more withdrawn, harder to talk to.  You'd ask him how he was feeling, and he would say okay, but it wasn't okay."  (Dkt. 85 at 204:10-12).  After the barium swallow test, Mr. Culhane's palliative care specialist Dr. Calkins noted that he represented "if he can't swallow on his own, then he doesn't want to pursue life."  (Def. Ex. 400 at 1847).  Dr. Calkins further noted that Mr. Culhane thought he was dying and would not see Mrs. Culhane's next birthday.  (*Id.*).

Defendant points to portions of the medical records after the 2017 surgery where Dr. Thompson noted that Mr. Culhane's mental state was normal or that he denied depression and anxiety.  (*See* Def. Ex. 400 at 3486, 4175, 4459, 4461, 4809, 4811, 4886, 4888, and 5118).  However, Dr. Thompson testified that she does not always ask patients if they are feeling depressed or at risk of suicide.  (Dkt. 85 at 101:8-13).  Moreover, even if the symptoms discussed above do not rise to the level of clinically-diagnosed depression or anxiety, they demonstrate that Mr. Culhane's mental health has diminished since the recurrence and surgery.

### 7.   Ability to Socialize

Mr. and Mrs. Culhane cannot attend social gatherings like BBQs or breakfasts with other couples like they used to because Mr. Culhane cannot eat in public.  (Dkt. 85 at 205:16-17; Dkt. 86 at 41:10-15).  Mr. Culhane testified that it takes him about three times as long to eat as it takes Mrs. Culhane, and it is easy for him to swallow something the wrong way and have a coughing spell, and he does not want "to have something like that happen in a restaurant or anything like that."  (Dkt. 86 at 41:10-15).  Mr. Culhane does still

go to his morning coffee club with his friends, but after his tonsil surgery, he does not eat anything while there.  (Dkt. 85 at 208:12-19).

### 8. Impacts on Mrs. Culhane

After Mr. Culhane's tonsil cancer diagnosis, Mrs. Culhane became his 24-hour caregiver.  (Dkt. 77 at 140:5-6).  She took care of him after his surgery, takes him to all his doctor's appointments, and continues to prepare special meals for him.  (*Id.* at 140:4-11).  When Mr. Culhane had the recurrence, she was "scared to death" because she knew they did not operate on Mr. Culhane initially because of the morbidity of the surgery.  (*Id.* at 105:9-14).  As Mrs. Culhane testified, "I live with my husband who has cancer.  I live with my husband who probably, from my point, will get it back.  This is my life every day, all day."  (*Id.* at 140:16-18).  Because of Mr. Culhane's condition, Mrs. Culhane is unable to do as much as an artist as she otherwise would.  (*Id.* at 141:15-142:7).  Additionally, because Mr. Culhane is no longer able to maintain the Land, Plaintiffs are in the process of selling the Land and moving to a new home.  (Dkt. 77 at 63:4-64:11; Dkt. 86 at 50:9-10).

## CONCLUSIONS OF LAW

### I. Medical Malpractice Claims

#### A. Federal Tort Claims Act

"The United States, as sovereign, is immune from suit save as it consents to be sued . . ., and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit."  *Liranzo v. United States*, 690 F.3d 78, 84 (2d Cir. 2012) (quoting *United States v. Mitchell*, 445 U.S. 535, 538 (1980)).  "Congress can waive the government's sovereign immunity, but only through clear and unequivocal statutory language, and

waivers of sovereign immunity and their conditions must be strictly construed in the government's favor." *Kwitek v. U.S. Postal Serv.*, 694 F. Supp. 2d 219, 224 (W.D.N.Y. 2010). The FTCA "'constitutes a limited waiver by the United States of its sovereign immunity' and allows for a tort suit against the United States under specified circumstances." *Hamm v. United States*, 483 F.3d 135, 138 (2d Cir. 2007) (quoting *Millares Guiraldes de Tineo v. United States*, 137 F.3d 715, 719 (2d Cir. 1998)).

> [T]he FTCA waives the sovereign immunity of the United States against claims for property damage or personal injury "caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."

*McGowan v. United States*, 825 F.3d 118, 125 (2d Cir. 2016) (quoting 28 U.S.C. § 1346(b)(1)).

"[T]he FTCA does not itself create a substantive cause of action against the United States; rather, it provides a mechanism for bringing a state law tort action against the federal government in federal court." *In re Orthopedic Bone Screw Prod. Liab. Litig.*, 264 F.3d 344, 361-62 (3d Cir. 2001), *as amended* (Oct. 10, 2001); *see Woodworth v. United States*, No. 1:14-CV-00674-RJA-JJM, 2017 WL 6884407, at *3 (W.D.N.Y. Dec. 27, 2017) ("[T]he FTCA 'does not create federal substantive causes of action.'" (quoting *Sumner v. United States*, 794 F. Supp. 1358, 1364 (M.D. Tenn. 1992))); *see also Liranzo v. United States*, 690 F.3d 78, 86 (2d Cir. 2012) ("[T]he FTCA directs courts to consult state law to determine whether the government is liable for the torts of its employees."). "[T]he test established by the Tort Claims Act for determining the United States' liability is whether

a private person would be responsible for similar negligence under the laws of the State where the acts occurred." *Dorking Genetics v. United States*, 76 F.3d 1261, 1266 (2d Cir. 1996) (quoting *Rayonier Inc. v. United States*, 352 U.S. 315, 319 (1957)).  Stated another way, "[u]nder the FTCA's private analogue requirement, a plaintiff's cause of action must be comparable to a cause of action against a private citizen recognized in the jurisdiction where the tort occurred." *Watson v. United States*, 865 F.3d 123, 134 (2d Cir. 2017) (quotation marks and citation omitted).

### B.   Medical Malpractice Standard Under New York Law

"To establish a *prima facie* case of negligence under New York Law, a plaintiff must establish: '(1) a duty owed by the defendant to the plaintiff, (2) a breach thereof, and (3) injury resulting therefrom.'"  *Citarella v. United States*, 86 F. Supp. 3d 151, 154 (E.D.N.Y. 2015) (quoting *Solomon v. City of New York*, 66 N.Y.2d 1026, 1027 (1985)).[9]

"[A] plaintiff asserting a medical malpractice claim must demonstrate that the doctor deviated from acceptable medical practice, and that such deviation was a proximate cause of the plaintiff's injury."  *James v. Wormuth*, 21 N.Y.3d 540, 545 (2013).  With respect to the first element of a medical malpractice claim under New York law:

> A physician's obligations to his patient are to possess at least the degree of knowledge and skill possessed by the average member of the medical profession in the community in which he practices, to exercise ordinary and reasonable care in the application of that professional knowledge and skill, and to use his best judgment in the application of his knowledge and skill.

---

[9]   "New York law applies because the incident occurred in this state."  *Qin Chen v. United States*, 494 F. App'x 108, 109 n.3 (2d Cir. 2012) (citing *Makarova v. United States*, 201 F.3d 110, 114 (2d Cir. 2000)).

*Mann v. United States*, 300 F. Supp. 3d 411, 419 (N.D.N.Y. 2018) (quoting *Sitts v. United States*, 811 F.2d 736, 740 (2d Cir. 1987)).   To establish proximate cause, "a plaintiff must generally show that the defendant's negligence was a substantial factor in producing the injury to satisfy the burden of proving a prima facie case in a medical malpractice action." *Wild v. Catholic Health Sys.*, 21 N.Y.3d 951, 954-55 (2013) (quotations omitted).

"Where, as here, the plaintiff alleges that the defendant negligently failed or delayed in diagnosing and treating a condition, a finding that the negligence was a proximate cause of an injury to the patient may be predicated on the theory that the defendant thereby 'diminished [the patient's] chance of a better outcome[.]'" *Clune v. Moore*, 142 A.D.3d 1330, 1331 (4th Dep't 2016) (alteration in original) (quoting *Wolf v. Persaud*, 130 A.D.3d 1523, 1525 (4th Dep't 2015)); *see Goldberg v. Horowitz*, 73 A.D.3d 691, 694 (2d Dep't 2010) ("A plaintiff's evidence of proximate cause may be found legally sufficient even if his or her expert is unable to quantify the extent to which the defendant's act or omission decreased the plaintiff's chance of a better outcome or increased the injury, 'as long as evidence is presented from which the jury may infer that the defendant's conduct diminished the plaintiff's chance of a better outcome or increased [the] injury.'" (alteration in original) (quoting *Alicea v. Ligouri*, 54 A.D.3d 784, 786 (2d Dep't 2008))).   "[T]he plaintiff must present evidence from which a rational jury could infer that there was a 'substantial possibility' that the patient was denied a chance of the better outcome as a result of the defendant's deviation from the standard of care." *Clune*, 142 A.D.3d at 1331-32 (quoting *Gregory v. Cortland Mem. Hosp.*, 21 A.D.3d 1305, 1306 (4th Dep't 2005)); *see Candia v. Estepan*, 289 A.D.2d 38, 39-40 (2001) (finding burden was on

plaintiff to demonstrate "absent defendant's malpractice, there was a substantial possibility that the decedent could have been cured or that her life could have been prolonged").

### C.   Plaintiffs Have Not Proven Negligence and Medical Malpractice for Failure to Timely Diagnose Malignant Melanoma by a Preponderance of the Evidence

Plaintiffs have not established by a preponderance of the evidence that Dr. Friedman's conduct in misdiagnosing Mr. Culhane with a junctional nevus fell below the standard of care or that it proximately caused any injury to Plaintiffs.  As discussed above, while the Court credits Dr. Harrist's opinion that Dr. Friedman's diagnosis of "focal early junctional nevus" was incorrect (*see* Dkt. 83 at 62, 67-71), not all misdiagnoses rise to the level of deviations from the standard of care.  *See, e.g., DiLorenzo v. Zaso*, 148 A.D.3d 1111, 1115 (4th Dep't 2017) (holding doctor who misdiagnosed rheumatic fever as probable benign joint pain did not depart from accepted standard of care by not considering patient's history of strep throat); *see also Nestorowich v. Ricotta*, 97 N.Y.2d 393, 398 (2002) ("[A] doctor is not liable in negligence merely because . . . a diagnosis proves inaccurate. Not every instance of failed treatment or diagnosis may be attributed to a doctor's failure to exercise due care.").   Here, it is undisputed that the Original Slide did not contain melanoma, and while Dr. Friedman did not make the same diagnosis that Dr. Harrist or Dr. Goldenberg did, he did also correctly identify melanocytic atypia in the slide. (Dkt. 70 at ¶ 10).  The Court further cannot conclude, for the reasons discussed at length above, that the degree of melanocytic atypia present on the Original Slide should have caused Dr. Friedman to suspect melanoma in situ was present elsewhere in the lesion.  The Court thus does not find that Dr. Friedman deviated from the standard of care by not

diagnosing either lentigo maligna or a condition "consistent with" lentigo maligna, where "consistent with" lentigo maligna means lentigo maligna is likely present elsewhere in the lesion.

Further, Dr. Goldenberg testified that if a lesion is diagnosed as having focal atypia, as Mr. Culhane's was, then a dermatologist "should follow it clinically to see if it progresses" into cancer. (Dkt. 95 at 32:19-25). He further testified that he would bring the patient back in three to six months to check on the lesion to make sure it did not progress into something more abnormal. (*Id.* at 33:24-34:7). Dr. Harrist, Plaintiffs' own expert, testified that when the dermatologist received Dr. Friedman's report, "[s]he should have performed more diagnostic testing[.]" (Dkt. 83 at 128). In other words, Dr. Friedman's diagnosis of focal atypia should have led to some action and monitoring by the treating dermatologist, not total dismissal. Indeed, in the instant matter Mr. Culhane was asked to come in for a follow-up appointment three months after his diagnosis was relayed to him (Dkt. 70 at ¶ 10), an appointment Mr. Culhane himself cancelled (*id.* at ¶ 12). Under these circumstances, the Court is not persuaded that the misdiagnosis by Dr. Friedman rises to the level of medical malpractice.

Additionally, for the reasons discussed at length above, the Court does not find persuasive Dr. Harrist's opinion that Dr. Friedman's failure to recommend a shave biopsy fell below the standard of care, nor does it credit Plaintiffs' unsupported contention that Dr. Friedman should have taken other steps to work up the punch biopsy sample. Accordingly, Plaintiffs have not demonstrated by a preponderance of the evidence that Dr.

Friedman's conduct fell below the standard of care or that his misdiagnosis proximately caused any injuries to Plaintiffs.

> **D.     Plaintiffs Have Proved Negligence and Medical Malpractice for Failure to Timely Diagnose Throat/Tonsil Cancer by a Preponderance of the Evidence**

Defendant has conceded that its failure to diagnose Mr. Culhane with squamous cell carcinoma in September 2013 was a departure from the standard of care and that its radiologist should have performed a CT scan with contrast on September 4, 2013. (Dkt. 77 at 10-12). Accordingly, the Court must determine whether the delay in diagnosis that resulted from these deviations from the standard of care caused Plaintiffs' injuries.

As previously discussed, the Court finds, based on its assessment of the credibility and persuasiveness of Dr. Packer's and Dr. Wenig's opinions, that Plaintiffs have shown by a preponderance of the evidence that the delay in diagnosis of Mr. Culhane's squamous cell cancer diminished his chance of a better outcome. As set forth in detail above, the Court finds credible the opinion of Dr. Packer who opined to a reasonable degree of medical certainty that the 20-month delay in diagnosis more likely than not caused Mr. Culhane's recurrence and his need for treatment of the recurrence. Additionally, the Court finds persuasive Dr. Packer's opinion that because Mr. Culhane has already had a recurrence he is more likely to have another one, that Mr. Culhane is more likely to die if he has a second recurrence, and that the increased likelihood of a second recurrence will last at least until March 2022, five years after the date of Mr. Culhane's March 2017 surgery. Accordingly, Plaintiffs have shown "there was a substantial possibility that [Mr. Culhane] was denied a chance of the better outcome as a result of the defendant's deviation

from the standard of care" with regards to his tonsil cancer.  *Clune*, 142 A.D.3d at 1331-32 (quotation omitted).  Accordingly, Plaintiffs have demonstrated medical malpractice with respect to the delay in diagnosis of Mr. Culhane's throat/tonsil cancer.

## II.   <u>Damages</u>

Having found in Plaintiffs' favor with respect to liability on the medical malpractice claims for failure to timely diagnose the throat/tonsil cancer, the Court must determine what damages Plaintiffs are entitled to collect.  "Courts are not required to provide lengthy analyses in support of their damages findings but they are required under Fed. R. Civ. P. 52(a) to adequately explain the subsidiary facts and methodology underlying the ultimate finding."  *Henry v. Champlain Enters., Inc.*, 445 F.3d 610, 622 (2d Cir. 2006) (internal quotation omitted).  Accordingly, the Court will set forth the rationale for its damages determination below.

### A.   <u>Pain and Suffering</u>

Generally speaking, the damages available under the FTCA are determined by state law, with the exceptions that pre-judgment interest and punitive damages are not available. *See Molzof v. United States*, 502 U.S. 301, 305 (1992).  It is Plaintiffs' burden to "present evidence that provides the finder of fact with a reasonable basis upon which to calculate the amount of damages." *Makinen v. City of New York*, 167 F. Supp. 3d 472, 497-98 (S.D.N.Y. 2016) (internal quotation omitted), *aff'd in part, rev'd in part on other grounds*, 722 F. App'x 50 (2d Cir. 2018).

"In New York, the trier of fact may award a prevailing plaintiff damages for non-economic losses sustained as a result of the injury and its concomitant conscious pain and

suffering, including the loss of enjoyment of life." *Robinson v. United States*, 330 F. Supp. 2d 261, 293 (W.D.N.Y. 2004). "There is no precise rule for fixing the value of non-economic damages. Instead, the trier of the facts must determine the value from all of the evidence in the particular case." *Id.* "Damage awards in analogous cases provide an objective frame of reference, but they do not control [the Court's] assessment of individual circumstances." *In re Air Crash Near Nantucket Island, Mass., on Oct. 31, 1999*, 307 F. Supp. 2d 465, 469 (E.D.N.Y. 2004) (internal quotation omitted).

Here, the record supports a conclusion that the surgery itself was "morbid." The Court has found that Mr. Culhane experienced significant pain, dysphagia, urinary hesitancy, urinary retention, soreness of his left jaw, sore throat, left marginal mandibular weakness, and facial drooping in the week following his surgery. (Pl. Ex. 95 at 1538; Def. Ex. 400 at 1877; Dkt. 86 at 43:23-44:3). Mr. Culhane was also in pain due to the surgery for at least ten weeks after his discharge from the hospital, and experienced constipation, nausea, pain, lack of energy, difficulty sleeping, and a weight loss of 20 pounds. (Def. Ex. 400 at 1817-23). Mr. Culhane did receive pain medication throughout this time period which helped reduce his pain, but while "under New York law . . . whether the patient was on pain medication [is] a factor in making a pain and suffering award," pain medication may only reduce, not eliminate, a pain and suffering award. *Coolidge v. United States*, No. 10-CV-363S, 2020 WL 3467423, at *29 (W.D.N.Y. June 25, 2020) (citing *Scullari v. United States*, Nos. 99-6160(L), 99-6219(XAP), 2000 WL 232786 (2d Cir. Feb. 24, 2000) (table decision)); *see McDougald v. Garber*, 73 N.Y.2d 246, 255 (1989) (holding "simply

that there must be 'some level of awareness' in order for plaintiff to recover" for all aspects of nonpecuniary loss, including pain and suffering).

Additionally, Mr. Culhane has had to undergo at least one other surgical biopsy to determine if he has had another recurrence (Pl. Ex. 95, at 1447, 1817-18), and the surgery contributed to his need for shoulder replacement surgery (*id.* at 1798-1801; Def. Ex. 400 at 646-47, 1792, 1841, 1852-53, 3482, 4034, 4189, 4267).

With regards to Mr. Culhane's future pain and suffering, as discussed in more detail in the Findings of Fact, Plaintiffs have shown by a preponderance of the evidence that Mr. Culhane's neck stiffness, tongue deviation and its impact on his speech, and occasional neck cramping were caused by the surgery.  Moreover, Mr. Culhane's mental health has diminished since the surgery, as has the ability for both Mr. and Mrs. Culhane to socialize.

However, the Court finds that Plaintiffs have not shown by a preponderance of the evidence that the surgery was a significant cause of Mr. Culhane's swallowing difficulties. While the medical records do not reflect Mr. Culhane's swallowing issues manifesting until after the surgery, Mr. Culhane acknowledged during his testimony that he had difficulties with swallowing before the surgery due to a lack of saliva, and Dr. Loree testified that radiation causes narrowing of the back of the throat resulting in difficulty swallowing in more than 60% of cases, and that this narrowing can manifest "20 years after the radiotherapy . . . [, a] year later or five years later."  (Dkt. 94 at 51-2).  Dr. Loree further testified that the surgery "generally . . . doesn't cause any swallowing problems" and "doesn't [affect] swallowing in most people."  (*Id.* at 54).  Accordingly, while it is possible that the scar tissue from the surgery could have slightly impacted Mr. Culhane's ability to

swallow (*see id.* at 52:12-13, 54:11-12), the Court concludes that Plaintiffs have not met their burden to establish that it is more likely than not that Mr. Culhane's swallowing difficulties were substantially caused by the surgery rather than the radiation. Moreover, while some of the decline in Mr. Culhane's physical stamina can be attributed to the 2017 surgery, a significant portion of Mr. Culhane's decline in physical ability was caused by his 2015 chemotherapy and radiation treatment, as well as the natural aging process.

Regarding Mr. Culhane's loss of chance of cure, the Court has found based on the opinion of Dr. Packer that Mr. Culhane's chance of survival is lower because of the 20-month delay, he is more likely to have a second recurrence because he has already had one, he is more likely to die if he has a second recurrence, and the increased likelihood of a second recurrence will last at least until March 2022. Dr. Packer was unable to quantify exactly how much Mr. Culhane's chance of survival decreased due to the lack of scientific data on the topic, although regardless the fact that a second recurrence would be more difficult for Mr. Culhane to recover from has impacted his mental health.

The Court has surveyed other malpractice cases, including, but not limited to, the following: *Coolidge*, 2020 WL 3467423, at *34 (awarding $30,000 per day for conscious pain and suffering of sedated plaintiff who underwent endovascular abdominal aortic aneurysm repair); *Mann v. United States*, 300 F. Supp. 3d 411, 420-21 (N.D.N.Y. 2018) (awarding $1,250,000 for 20 months of pain and suffering following three-year delay in diagnosis of lung cancer by Veteran's Administration); *Antonucci v. Fond, M.D.*, JVR No. 1411250030, 2014 WL 6660350 (Sup Ct. Rockland Cty. July 30, 2014) (awarding $910,000 for pain and suffering and $650,000 in spousal derivative claim for delayed

diagnosis that caused previously unnecessary total hip replacement procedure, limiting motion and enjoyment of life); *Muir v. Rao, M.D.*, 2007 WL 1039327 (New York Sup. Ct. Kings Cty. Feb. 2, 2017) (settling for $1,500,000 claims by plaintiff in early 50s that delayed diagnosis of breast cancer reduced chance of cure from 90-95% to 75-85% and caused pain and suffering); *Cruz v. Skukla, M.D.*, 2006 WL 1529160 (New York Sup. Ct. New York Cty. Apr. 20, 2006) (settling for $1,200,000 claim by 26-year-old plaintiff, claiming $25,000 in lost wages, that delayed diagnosis of ovarian cancer decreased chance of cure by 8% and necessitated six months of chemotherapy); *Cramer v. Benedictine Hosp.*, 301 A.D.2d 924, 930 (3d Dep't 2003) (estate of 30-year-old mentally disabled decedent awarded $350,000 for 6 days pain and suffering despite being in coma during other portions of hospitalization); *McHale v. Tijoe, M.D.*, JVR No. 471685, 2002 WL 34232979 (N.Y. Sup. Ct. Sept. 1, 2002) (jury award of $2,000,000 for  pain and suffering and $1,000,000 for a spousal derivative claim when a delayed diagnosis of the 49-year-old plaintiff's throat cancer caused removal of portions of the soft palate, jaw, and tongue and resulted in speech impediments and a restriction in taking nourishment by mouth, parties settled after trial for $750,000); *Pastorelli v. Saltzman, M.D.*, JVR No. 69347, 1991 WL 449884 (New York Sup. Ct. Queens Cty. June 1, 1991) (jury award of $1,000,000 to 55-year-old plaintiff who "suffered the removal of three-fourths of the tongue, half of the floor of the mouth, half of the lower jaw, and portions of the neck" and who suffered voice changes and difficulty swallowing after a neck dissection caused by a delayed diagnosis of his cancer and $200,000 to the plaintiff's spouse).  The Court has listed the amounts actually awarded in each of these cases, but has taken into account "their present dollar value adjusted for

inflation" in making its determination. *Dixon v. Agbai*, No. 15CIV850ATAJP, 2016 WL 3702749, at *5 n.3 (S.D.N.Y. July 8, 2016), *report and recommendation adopted*, 2016 WL 5660246 (S.D.N.Y. Sept. 28, 2016).

Having considered all the evidence of record, the awards made in comparable cases (while acknowledging the differences in age and treatment), and the specific factual circumstances of this case, the Court concludes that an award of $1,250,000 for past pain and suffering, and $600,000 for future pain and suffering is appropriate.  The Court finds that these amounts are sufficient to reasonably compensate Mr. Culhane for his pain and suffering and the concomitant loss of enjoyment of life.  Additionally, the Court finds that pursuant to binding Second Circuit precedent, the award for future pain and suffering must be discounted to present value. *Metz v. United Techs. Corp.*, 754 F.2d 63, 67 (2d Cir. 1985) ("[W]e agree with the courts that subscribe to the view that it is proper to discount awards for future pain and suffering to present value.").   However, because there has been no briefing on what a proper present value calculation would be for the instant matter, the Court reserves decision on what the reduction amount should be and orders further briefing as detailed later in this Decision and Order.

Defendant also raises for the first time in its proposed conclusions of law that New York Civil Practice Law and Rule ("CPLR") Article 50-A "may apply here," specifically CPLR 5031.  (Dkt. 98 at ¶¶ 162-64).  Plaintiffs contend that the Court should not consider the application of this provision because Defendant failed to raise this issue previously, and it is now untimely and would prejudice Plaintiffs.  (Dkt. 105 at ¶ 161).

There appears to be a split among circuits as well as within this Circuit as to whether CPLR Article 50-A applies to FTCA cases. *Malmberg v. United States*, No. 506CV1042FJSTWD, 2018 WL 1801958, at *11 (N.D.N.Y. Apr. 13, 2018) (collecting cases) ("[A]lthough several circuits have permitted the government to make non-lump-sum payments, including periodic payments from a reversionary trust, under certain circumstances, the Second Circuit has not addressed this issue; and lower courts in the Second Circuit are divided as to whether courts must enter FTCA judgments entirely in a lump sum."), *rev'd in part on different grounds, vacated in part on different grounds*, 777 F. App'x 554 (2d Cir. 2019). Given the uncertainty of the legal framework and the lack of briefing on the matter, the Court also reserves decision on the issue of whether CPLR Article 50-A applies to the instant matter and orders further briefing, as detailed below.

### B.    Loss of Consortium

"The cause of action for loss of consortium is designed to 'compensate for the injury to th[e marital] relationship' and to 'the interest of the injured party's spouse in the continuance of a healthy and happy marital life. . . .  An award for loss of consortium may include components for both the past and the future." *Rangolan v. County of Nassau*, 370 F.3d 239, 248 (2d Cir. 2004) (citations omitted).  "Consortium represents the marital partner's interest in the continuance of the marital relationship as it existed at its inception." *Buckley v. National Freight, Inc.*, 90 N.Y.2d 210, 214 (1997).  "Loss of consortium is a derivative claim; as long as the defendant is liable to an injured spouse, a valid cause of action can exist for the other spouse." *Hassanein v. Avianca Airlines*, 872 F. Supp. 1183, 1190 (E.D.N.Y. 1995).  "Derivative claims such as these are predicated on physical or

mental injury or incapacity of that spouse." *Id.* (quotations omitted). "The concept of consortium includes not only loss of support of services, it also embraces such elements as love, companionship, affection, society, sexual relations, solace and more." *Delosovic v. City of New York*, 143 Misc.2d 801, 810 (N.Y. Sup. Ct. 1989) (quoting *Millington v. Southeastern Elevator Co., Inc.*, 22 N.Y.2d 498, 502 (1968)), *aff'd*, 174 A.D.2d 407 (1st Dep't 1991).

Although, as with Mr. Culhane, Mrs. Culhane's injury as a spouse can be attributed, in part, to the chemotherapy and radiation that Mr. Culhane would have had to undergo regardless, the amount of time she spent serving as Mr. Culhane's caretaker after his March 2017 surgery can be attributed to the recurrence. Additionally, Mr. Culhane's further loss of stamina after the surgery has prevented him from growing food for them in their garden and contributed to his inability to maintain the Land, resulting in Mrs. Culhane moving off of the property somewhat sooner than they had otherwise intended, although they would have had to move eventually. The Court has considered comparable cases regarding consortium, including: *Gonzalez v. United States*, __ F. Supp. 3d __, No. 17CIV3645GBDOTW, 2020 WL 1548067, at *9 (S.D.N.Y. Mar. 31, 2020) (FTCA case involving a delayed cancer diagnosis by the VA, where the decedent's spouse was awarded $50,000 for loss of consortium for two years on top of $55,000 for lost services despite there not being trial testimony on the matter because the decedent and his spouse had been married for many decades); *Pastorelli*, 1991 WL 449884 (jury award of $200,000 to the plaintiff's spouse, where plaintiff was 55-years old and "suffered the removal of three-fourths of the tongue, half of the floor of the mouth, half of the lower jaw, and portions of

the neck" and who suffered voice changes and difficulty swallowing after a neck dissection caused by a delayed diagnosis of his cancer).

Based on this, all of the other relevant case law outlined above, and the facts of this case (including Plaintiffs' ages), the Court finds an award of $100,000 for loss of consortium and lost services to Mrs. Culhane is appropriate.

## CONCLUSION

For the foregoing reasons, the Court finds that Plaintiffs have failed to establish medical malpractice for failure to timely diagnose Mr. Culhane's malignant melanoma, but have established medical malpractice for failure to timely diagnose Mr. Culhane's squamous cell carcinoma. Additionally, the Court finds that Plaintiffs have established their entitlement to recover a total of $1,950,000 in damages for the injuries that they have proven they suffered as a result of Defendant's actions. The parties are directed to submit further briefing on the issues of what a proper present value calculation would be for the future pain and suffering damages award and whether CPLR Article 50-A—specifically CPLR § 5031—applies in the instant matter. The parties' initial simultaneous submissions on those issues are due on or before January 15, 2021, with any responsive papers due on or before January 22, 2021.

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

DATED:    December 28, 2020
          Rochester, New York